AARONS WARD, APC
Martin I. Aarons, Bar No. 233879
martin@aaronsward.com
Shannon H.P. Ward, Bar No. 308280
shannon@aaronsward.com
Samuel C.P. Hauser, Bar No. 346602
sam@aaronsward.com
23801 Calabasas Road Suite 2001
Calabasas CA 91302
Telephone:   818-794-7100
Facsimile:    818-302-2072
Attorneys for Plaintiff, Dennis Lytton

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALVA DENNIS LYTTON<br><br>                Plaintiff(s),<br><br>    v.<br><br><br>SOUTHERN CALIFORNIA REGIONAL RAIL AUTHORITY, et al.<br><br><br>             Defendant(s). | Case No.: 2:23-cv-03166-DSF-PDx<br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>Judge:  Honorable Wesley L. Hsu<br><br>Date: July 21, 2023<br>Time: 1:30 PM<br>Courtroom: 9B<br><br>Original Complaint: March 16, 2023<br>Removal: April 27, 2023<br>Responsive Pleading: April 27, 2023<br>Trial Date: Not Yet Set |

**TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

    **TAKE NOTICE THAT** Plaintiff, Dennis Alva Lytton, submits his Opposition to Defendant's Motion to Compel Arbitration as follows:

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Defendants' motion must be denied for two reasons: (1) As a railroad employee, Mr. Lytton is exempt from the FAA, (2) even if the Residual Clause of the FAA did not apply, the arbitration agreement still fails because it is both procedurally and substantively unconscionable. For these reasons, the Court must deny Defendants' Motion to Compel Arbitration.

### II.    SUMMARY OF FACTS

Plaintiff, Mr. Lytton, was hired in June 2020 by Amtrak to help negotiate a contract with Metrolink. In October of 2020, Amtrak was awarded a contract to provide train and engine services to Metrolink and Mr. Lytton began working as an Amtrak-Metrolink Safety Manager. During Mr. Lytton's application process and onboarding he was presented with numerous online web pages containing various information and documents to sign and/or retain copies of. One such web page consisted of an "Acknowledgment" that he had been provided with Amtrak's Arbitration Agreement. See Defendant's Ex A.

Mr. Lytton experienced systematic retaliation for speaking up as a whistleblower for numerous safety concerns and complaints, including but not limited to: concerns related to train crew assaults, defective and dangerous rail cars and locomotives, trains striking people due to homeless encampments, as well as other issues related to the safe operation of train and engine services. Mr. Lytton was terminated for whistleblowing on July 19, 2022. Mr. Lytton filed his lawsuit against Defendants in March of 2023. The Defendants are now erroneously moving to compel Mr. Lytton to Arbitration based on the alleged agreement.

### III.    ARGUMENT

#### A.    As a Railroad Employee, the FAA Does Not Apply to Mr. Lytton Because of the Residual Clause Exemption.

There is no dispute that Mr. Lytton is a railroad employee, and that the FAA does not apply to railroad employees. 9 U.S.C. § 1. Specific situations exist where the FAA is wholly prohibited from interfering. This case is one of those instances.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

The FAA states, in plain language, in a part also known as the "Residual Clause" that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Defendant, in its motion, states the parties "adopted the FAA — all of it — to govern their arbitration." (Docket # 16.1 - 5:19-20). However, the plain language of the FAA is meant to remove instances just like this out from under the Act's purview. The United States Supreme Court agrees. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109–11 (2001).

In *Circuit City*, the Supreme Court held that the § 1 exemption applied only to transportation worker contracts such as the specifically enumerated "seaman" and "railroad employees". The residual clause in the Act exempts certain contracts from the FAA, prohibiting arbitration in those contexts. *Circuit City*, 532 U.S. at 118–19. As such, the contract in this case is exempt from arbitration.

In *Southwest Airlines v. Saxon*, U.S., 142 S. Ct. 1783, 213 L.Ed.2d 27 (2022), the Supreme Court answered the question of whether an airline ramp supervisor fell into a category of worker exempt from the FAA. *Id.* at 1787. In that case, the Court reiterated that, to determine whether § 1's exemption applies, the relevant class of workers must be compared to the "seamen" and "railroad employees" whom Congress specifically exempted from the FAA in 1925. The closer a class of workers comes to those groups, the more likely the workers will be deemed exempt from the FAA under § 1's residual clause. *Saxon*, 142 S. Ct. at 1788–93. In *Saxon,* the Supreme Court uses "railroad employees", along with "seaman", as the definitive archetypal roles which are meant to be exempted from the FAA. Mr. Lytton is a railroad employee and is thus exempt from the FAA's reach.

Additionally, Ninth Circuit courts have held that while FAA affords courts the power to enforce arbitration agreements, it does not do so when those agreements involve transportation workers, such as railroad employees. *Romero v. Watkins and Shepard Trucking, Inc.*, 9 F.4th 1097 (2021). The residual clause acts as a limit on the court's power and, thus, cannot be waived. *Id.* at 1100. *See also Johnson v. Schneider National, Inc.*, 592 F.Supp.3d 768 (2022) (waiver of §

1 by the parties, then, would remove the limit of authority placed upon this Court by Congress, and such a waiver cannot stand.).

Therefore, this cause of action is not subject to arbitration under the purported agreement to arbitrate because the governing law of the FAA expressly excludes railroad employees, such as Mr. Lytton, from its provisions. Additionally, the railroad employee exemption in the residual clause *cannot* be waived in a private contract. Therefore, Plaintiff had no legal capacity to agree to arbitration and thwart Congress' intent.

**B.** **Even if the "Residual Clause" of the FAA did not exempt Mr. Lytton from forced arbitration, the "arbitration agreement" is still void for unconscionability.**

On a motion to compel arbitration, the moving party has the initial burden of showing that a valid agreement to arbitrate exists. *Carvant Fin. LLC v. Autoguard Advantage Corp.*, 958 F. Supp. 2d. 390, 395 (E.D.N.Y. 2013). Courts across the country have held that the validity of the arbitration agreement is determined by state contract law. *Henggeler v. Brumbaugh & Quandahl, P.C., LLO*, 894 F.Supp.2d 1180, 1187 (D. Neb. 2012); see also *Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 4 (1st Cir. 2012). This means there must be an offer, acceptance, and consideration. *Henggeler* 894 F.Supp.2d 1180, 1186. The agreement must also not be unconscionable to be valid. *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114. Here, Defendants have failed to overcome this burden.

Under the doctrine of unconscionability, there must be both procedural and substantive unconscionability, "the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." *Baltazar v. Forever 21, Inc*. (2016) 62 Cal.4th 1237, 1243. Though both are needed for a court refuse to enforce a contract or clause, they need not be equal and the two exist in a sliding scale relationship. *Murrey v. Superior Court* (2023), 87 Cal.App.5th 1223, at 1236; See also *Gutierrez v. Autowest, Inc.* (2003) 114 Cal. App. 4th 77, 87 (as modified on denial of reh'g (Jan. 8, 2004) (citing *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 111). More, the "FAA does not preempt 'generally applicable contract defenses, such as fraud, duress, or unconscionability." *Sanchez v. Valencia*

*Holding Co., LLC* (2015) 61 Cal. 4th 899, 906. Meaning, *Armendariz* applies even in federal court, regardless of whether the Federal Arbitration Act (FAA) applies.

The inquiry into unconscionability begins with analyzing whether the contract or clause is one of adhesion; and, if the contract is found to be one of adhesion the inquiry must then move on to other factors in determining its enforceability. *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114.

### 1.   The Arbitration Agreement is procedurally unconscionable because the agreement is a contract of adhesion.

The procedural element of unconscionability focuses on whether the employee was surprised or oppressed by the arbitration agreement in their employment contract. As stated in *Armendariz*, an arbitration agreement is procedurally unconscionable if it was a standardized contract, drafted by the party with superior bargaining power and gave the subscribing party a "take it or leave it" position. (2000) 24 Cal. 4th at 115. The California Supreme Court in *Armendariz* explained: "There is little dispute that [the agreement] was [adhesive]. It was imposed on employees as a condition of employment and there was no opportunity to negotiate." Id. at 114–15 As such, "take it or leave it" provisions are procedurally unconscionable. *Martinez v. Master Protection Corp.* (2004) 118 Cal.App.4th 107, 114.

Similarly, here, Mr. Lytton had the arbitration agreement forced on him as a condition of his employment with Amtrak, with no option to negotiate. Therefore, it is a contract of adhesion and thus, procedurally unconscionable.

### 2.   The Arbitration Agreement in Amtrak's contract with plaintiff is substantively unconscionable because it produces overly harsh and one-sided results.

The legal term substantive unconscionability focuses on overly harsh or one-sided results. *Armendariz,* supra, 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669. As stated above, though courts refuse to enforce only those agreements that are both procedurally and substantively unconscionable, the two factors need not each exist to the same degree. *Gutierrez v. Autowest* (2003) 114 Cal. App. 4th at 88. The California Supreme Court clarified that, "the more

substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz* (2000) 24 Cal. 4th at 114. Here, there is a high degree of substantive unconscionability due to the limited discovery as stated in Amtrak's arbitration agreement so much so that it is incapable of providing for adequate discovery in this case.

An agreement to arbitrate must "'ensure minimum standards of fairness' so employees can vindicate their public rights." (*Baxter v. Genworth North America Corp.* (2017) 16 Cal.App.5th 713, 727, quoting *Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 716.) California courts have regularly confirmed that discovery limitations favor employers as they already hold access to the majority of the documents and witnesses. (See *Armendariz*, 24 Cal.4th at 104.)

Further, "Employment disputes are factually complex, and their outcomes 'are often determined by the testimony of multiple percipient witnesses, as well as written information about the disputed employment practice.' [internal citation omitted.] Seemingly neutral limitations on discovery in employment disputes may be non-mutual in effect. This is because the employer already has in its possession many of the documents relevant to an employment discrimination case as well as having in its employ many of the relevant witnesses." (*Baxter*, 16 Cal.App.5th at 727, quoting *Fitz*, 118 Cal.App.4th at 717.) Amtrak's limitation on discovery serve to enhance their already obtained power imbalance in such a situation.

Amtrak's arbitration agreement provides that discovery will only consist of "up to three (3) depositions, including any expert depositions, but may not exceed 24 hours of total deposition time … iii. Each party may propound up to 15 interrogatories and 15 document requests to the other party." Ex. 1, ¶ 7.5(b).

Courts "must balance the 'desirable simplicity' of limiting discovery with employees' need for discovery 'sufficient to adequately arbitrate their statutory claim, including access to essential documents and witnesses, as determined by the arbitrator(s) and subject to limited judicial review.'" *Poublon v. C.H. Robinson Co.* (9th Cir. 2017) 846 F.3d 1251, 1270 (citing and quoting *Armendariz*, 24 Cal.4th at 106).) In finding this balance, California courts look to the amount of discovery permitted, the standard for obtaining additional discovery, and the evidence

1   presented by the employee that the discovery limitations will prevent them from adequately

2   arbitrating their statutory claims. (*Fitz*, 118 Cal.App.4th at 715-18.)

3       In *Fitz*, the court held that a limitation of 2 depositions, and "compelling need" standard to

4   get more discovery was unconscionable. *Fitz*, 118 Cal.App.4th 702, at 715-18. Similarly, in

5   *Baxter,* the court held that a limitation of 10 interrogatories, five document requests, two

6   individual depositions for a total of no more than eight hours, with "for good and sufficient cause

7   shown" standard to get more was unconscionable. *Baxter*, 16 Cal.App.5th at 727.

8       Here, Mr. Lytton's case involves whistleblower retaliation and wrongful termination. Mr.

9   Lytton was retaliated against by at least four separate corporate agents, and thus at the minimum

10  would require, at the bare minimum, at least five to six depositions (the arbitration agreement

11  only provides for three), not including the depositions of the person most knowledgeable for both

12  Amtrak and the Southern California Regional Rail Authority ("SCRRA"), which the arbitration

13  agreement expressly forbids. Additionally, the arbitration agreement states that the total time for

14  all three of the depositions "may not exceed 24 hours of total deposition time." These unequal

15  discovery limitations result in Mr. Lytton not being afforded the minimum standard of fairness the

16  law requires. *See Baxter v. Genworth North America Corp.* (2017) 16 Cal.App.5th 713, 727.

17      Additionally, this whistleblower retaliation case is centered around numerous safety

18  violations and protocols for both Amtrak and SCRRA. This case will likely encompass thousands

19  of documents and require numerous depositions. Any limitation on Plaintiff's right to propound

20  discovery and take depositions only benefits Defendants. It is Mr. Lytton who needs multiple

21  depositions to prove his case. It is Defendants, as Mr. Lytton's employer, who has unlimited and

22  unfettered access to all of its own employees. Even with normal FRCP discovery, Defendant

23  already has better access, and this draconian discovery limit only further serves to tip the scales.

24      Further, here, Mr. Lytton required to show some extra special need to obtain additional

25  discovery. As such, counsel will also be forced to disclose its work product to justify additional

26  depositions and/or written discovery. See Defendant's Ex. A, ¶ 7.5(c). Thus, it strains credulity to

27  think the discovery limitations as presented in the arbitration agreement would provide ensure

28  minimum standards of fairness for Mr. Lytton.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

1   One sided results are common for employees in arbitration with arbitration agreements

2   being routinely found to favor employers over employees.  The Economic Policy Institute issued

3   a recent study, revealing that, on average, employees win less often and receive much lower

4   damages in arbitration than they do in court.[1] Ex. 1.  According to data gathered by the American

5   Association of Arbitration, the nation's largest arbitration services provider, employee win rates

6   in mandatory arbitration are "much lower than in either federal court or state court, with

7   employees in mandatory arbitration winning only just about a fifth of the time (21.4 percent),

8   which is 59 percent as often as in the federal courts and only 38 percent as often as in state

9   courts."[2]  Additionally, employers also benefit from mandatory arbitration clauses because

10   comparable cases in arbitration tend to produce lower awards for employees than litigation, due in

11   part to the limited availability of punitive damages.[3] Ex. 2.  This data evidences that mandatory

12   arbitration agreements often create "overly harsh" or "one-sided" results favoring employers.

13   Here, Mr. Lytton does not need to show an overwhelming amount of substantive

14   unconscionability because, as discussed above, his contract is one of adhesion and surprise,

15   establishing a high degree of procedural unconscionability.  Further, Defendant Amtrak's

16   arbitration agreement is substantively unconscionable because it creates an overly harsh and one-

17   sided result, pigeon-holing Mr. Lytton in the losing side without an opportunity to negotiate as

18   receipt of the arbitration agreement was contingent on his employment.  Thus, the arbitration

19   agreement is invalid because it is both procedurally and substantively unconscionable.

20   Though policies exist favoring private arbitration, those policies "must sometimes yield

21   to its fundamentally contractual nature" and courts "must be particularly attuned to claims that

22   employers with superior bargaining power have imposed one-sided, substantively unconscionable

23   terms" to an adhesive preemployment arbitration contract." *Id.*  The *Murrey* Court reasoned that

24   private arbitration must not be used as "an instrument of injustice imposed on a take it or leave it

25

26   [1]  See Katherine V.W. Stone & Alexander J.S. Colvin, The Arbitration Epidemic: Mandatory arbitration deprives workers and consumers of their rights, ECON. POL'Y INST. (Dec. 7, 2015), https://www.epi.org/publication/the-arbitration-epidemic/.

27   [2] Id.

28   [3] See Janna Giesbrecht-McKee, The Fairness Problem: Mandatory Arbitration in Employment Litigation, 50 WILLAMETTE L. REV. 259, 266.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

basis." *Murrey v. Superior Court* (2023), 87 Cal.App.5th 1223, 1236.  In the present case, Defendant's arbitration clause is such an instrument of injustice.

## IV.    CONCLUSION

Plaintiff requests the Court to deny the Motion to Compel Arbitration.


Dated: June 30, 2023                              AARONS | WARD, APC


                                                  Martin I. Aarons
                                                  Shannon H.P. Ward
                                                  Samuel C.P Hauser
                                                  Attorneys for Plaintiff

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

# EXHIBIT 1



ECONOMIC POLICY INSTITUTE • DECEMBER 7, 2015 • EPI BRIEFING PAPER #414

# THE ARBITRATION EPIDEMIC

## Mandatory arbitration deprives workers and consumers of their rights

BY **KATHERINE V.W. STONE** AND **ALEXANDER J.S. COLVIN**

## Table of contents

Executive summary ............................................................................................................................. 3

Introduction: The problem ................................................................................................................ 3

    A quick primer on arbitration ....................................................................................................... 4

    An example of arbitration .............................................................................................................. 5

Where did the arbitration epidemic come from? ............................................................................. 6

    The FAA from 1925 to the mid-1980s ......................................................................................... 7

    The expanding reach of the FAA after 1985 ................................................................................ 7

    Supreme Court decisions on arbitration of employment contracts ........................................... 10

    Legal issues in arbitration today: Arbitration and class-action waivers ...................................... 10

How mandatory arbitration works ................................................................................................. 14

    The prevalence of mandatory arbitration and class-action waivers ........................................... 14

    The arbitration process ............................................................................................................... 17

    Outcomes of mandatory arbitration ........................................................................................... 18

    The use of arbitration as part of corporate HR .......................................................................... 23

What can be done? .......................................................................................................................... 25

    Arbitration Fairness Act .............................................................................................................. 25

    The Franken Amendment and the Fair Pay and Safe Workplaces Executive Order ................. 25

    Consumer Financial Protection Bureau ...................................................................................... 26

Conclusion ...................................................................................................................................... 26

Endnotes ......................................................................................................................................... 27

# Executive summary

In the past three decades, the Supreme Court has engineered a massive shift in the civil justice system that is having dire consequences for consumers and employees. The Court has enabled large corporations to force customers and employees into arbitration to adjudicate practically all types of alleged violations of countless state and federal laws designed to protect citizens against consumer fraud, unsafe products, employment discrimination, nonpayment of wages, and other forms of corporate wrongdoing. By delegating dispute resolution to arbitration, the Court now permits corporations to write the rules that will govern their relationships with their workers and customers and design the procedures used to interpret and apply those rules when disputes arise. Moreover, the Court permits corporations to couple mandatory arbitration with a ban on class actions, thereby preventing consumers or employees from joining together to challenge systemic corporate wrongdoing. As one judge opined, these trends give corporations a "get out of jail free" card for all potential transgressions. These trends are undermining decades of progress in consumer and labor rights.

This report tracks these developments and presents the most recent research findings, summarized here:

- It is common for employees to be presented with terms of employment that include both a clause that obligates them to arbitrate all disputes they might have with their employer and one that prohibits them from pursuing their claims in a class or collective action in court.

- Employees subject to mandatory arbitration can no longer sue for violations of many important employment laws, including rights to minimum wages and overtime pay, rest breaks, protections against discrimination and unjust dismissal, privacy protection, family leave, and a host of other state and federal employment rights.

- On average, employees and consumers win less often and receive much lower damages in arbitration than they do in court.

- Employers tend to win cases more often when they appear before the same arbitrator in multiple cases, indicating that they have a repeat-player advantage over employees from regular involvement in arbitration.

## Introduction: The problem

Over the past 25 years, it has become increasingly commonplace for corporations to insert arbitration clauses into their contracts with customers and employees. These clauses appear to be innocuous, or even beneficial, to consumers and employees, but they pack a powerful punch. They prevent customers and employees from going to court if they have a dispute. Instead, when there is an arbitration clause, consumers and employees are required to take their complaints to a privatized, invisible, and often inferior forum in which they are less likely to prevail—and if they do, they are less likely to recover their due. Moreover, once a dispute is decided by an arbitrator, there is no effective right of appeal.

At the time of contracting, most consumers and employees do not object to having an arbitration clause in their contracts. After all, who thinks they will have a dispute with their employer or their bank? Who would risk a valuable job opportunity or an important consumer financial transaction over an obscure procedural provision? And if a dispute should arise, who wants to go to court to resolve a dispute over a faulty product or nonpayment of overtime pay? Courts are slow, excessively technical, and intimidating to most people. To hire a lawyer to handle the case would usually cost more than most disputes are worth. Yet despite the seeming benefits of arbitration, there are serious pitfalls.

As the research cited in this report shows, consumers and employees often find it more difficult to win their cases in arbitration than in court. For one thing, arbi-

tration may not provide parties with the same extent of discovery that a court would. In certain types of cases, such as employment discrimination claims, it is practically impossible to win without the right to use extensive discovery to find out how others have been treated. In addition, while some arbitration agreements include due-process protections, others shorten statutes of limitations, alter the burdens of proof, limit the amount of time a party has to present his or her case, or otherwise impose constrictive procedural rules. In practice it is the corporation not the consumer or employee that gets to decide whether to include fairness protections in the arbitration procedure. Although a consumer or employee can try to challenge enforcement of unfair rules in court, the ability to challenge arbitration agreements has been substantially limited by the courts. Moreover, arbitrators are often reluctant to award generous damages to prevailing parties, and their awards are not appealable. On average, employees and consumers win less often and receive much lower damages in arbitration than they do in court. And in a new development, some arbitration agreements are requiring that the losing party pay all the arbitration fees, including the other side's attorney fees. The loser-pays clauses provide a powerful deterrent to workers or consumers asserting any claims.

The trend toward increasing use of arbitration in consumer and employment relationships threatens to undermine decades of achievements in worker and consumer rights. Over the past few decades, the courts have expanded the scope of arbitration, reduced the ability of individuals to avoid arbitrating their disputes, and narrowed the possibility of obtaining judicial review. They have adopted such sweeping pro-arbitration doctrines that arbitration clauses are almost always upheld when challenged in the courts, even when individuals can show that an arbitration clause was buried in fine print or incorporated by reference to an obscure and inaccessible source. Courts also uphold clauses even when an individual can show that an arbitration system is too expensive for him or her to use. The result has been that many

important employment rights can no longer be brought to a court by employees subject to mandatory arbitration. These rights include rights to minimum wages and overtime pay, rest breaks, protections against discrimination and unjust dismissal, privacy protection, family leave, and a host of other state and federal employment rights.

The most pernicious development in arbitration involves the coupling of arbitration with class-action waivers. Major corporations began to insert class-action prohibitions into arbitration clauses for consumer transactions in the late 1990s. Indeed, in 1999, the 10 major banks that issue credit cards—including American Express, Citibank, First USA, Capital One, Chase, and Discover—formed a group called "the Arbitration Coalition" to promote the use of arbitration clauses that bar class actions. This group also funded and jointly drafted amici curiae briefs to convince the Supreme Court to uphold these clauses.[1] In part as a result of their efforts, courts generally permit arbitration to be coupled with prohibitions on class-action lawsuits, both for consumer and employment class actions. Thus today it is common for employees to be presented with terms of employment that include both a clause that obligates them to arbitrate all disputes they might have with their employer and one that prohibits them from pursuing their claims in a class or collective action. The legal developments have de facto stripped employees of many of the legal rights and protections that they have fought long and hard to obtain.

## A quick primer on arbitration

Arbitration clauses are frequently included in the fine print that an individual is required to click through when making an online purchase. Arbitration clauses are also often included in the company orientation and personnel materials a worker receives when beginning a new job. Because these arbitration clauses are usually buried in a sea of boilerplate, many people who are subject to them do not realize that they exist or understand their impact. These terms are called mandatory or forced arbitration

because if the employee or consumer does not agree to arbitration, he or she will be denied employment or the ability to purchase the product or service. The employee or consumer has no real choice or ability to negotiate the terms of the arbitration clause. Mandatory arbitration in the consumer and employment setting is very different from arbitration clauses in contracts between two businesses or a company and a union; in those cases, the parties have voluntarily negotiated as equals and knowingly agreed to arbitrate disputes between them.

Unlike a court proceeding, there is no one form of arbitration. It is a term that describes a wide range of procedures that parties can design however they choose. In practice, however, arbitration typically takes place in a conference room, where parties are seated around a large table. Witnesses may or may not be in the room. Parties may or may not have lawyers. The arbitrator sits at the head of the table. He or she is not a judge and does not wear a judicial robe or other ceremonial garb. Rather, the arbitrator can be any person the parties have designated, although they frequently are lawyers. There is no court reporter or jury.

The arbitrator convenes the hearing and usually begins by explaining that it is an informal proceeding not subject to formal rules of evidence or procedure. Rather, he or she explains that the arbitrator's role is to hear any evidence that either side wants to submit and then render a binding decision. Instead of excluding inadmissible evidence based on objections from lawyers, the arbitrator will generally hear all the evidence and then decide how much weight to give it in reaching a decision. Witnesses are sworn in by the arbitrator and the proceeding begins. During the hearing, the party who initiated the proceeding tells his or her story and presents any documents or witnesses that support it. The other side has an opportunity to cross-examine. Then the defending party presents its case, also subject to cross-examination. The arbitrator may also ask questions of the witnesses. After the close of the hearing, the arbitrator considers the evi-

dence presented and issues an award. Often the award takes the form of a simple statement of who won, and the amount of the recovery, if any. Sometimes the arbitrator issues a written decision explaining the outcome. Once the arbitrator has ruled, there is no realistic possibility for appeal.

The greater flexibility and informality of arbitration compared with court proceedings means that the parties are relying much more on the neutrality, expertise, and fairness of the arbitrator in reaching a just outcome. This can work well when two equal parties come together to design an arbitration procedure and choose an arbitrator who they both trust. However, for consumers or employees who are required to enter into mandatory arbitration with a large corporation in order to buy a product or service or to get a job, removing these formal protections leaves them vulnerable to unfair procedures and unjust outcomes.

## An example of arbitration

One recent case illustrates the difficulties employees now face when trying to enforce their rights under basic employment statutes. In 2008, Stephanie Sutherland was hired by Ernst & Young to work as a "staff/assistant."[2] Her work involved relatively routine, low-level clerical work, for which she was paid a fixed salary of $55,000 per year. She routinely worked 45 to 50 hours per week, but because she was classified by her employer as exempt from overtime, she did not receive any additional compensation for overtime. By the time Ms. Sutherland was terminated in 2009, she had worked 151 hours of overtime, for which she should have been paid about $1,867, had the Fair Labor Standards Act (FLSA)[3] and New York state labor laws been observed. She filed a class-action lawsuit seeking to recover overtime pay for her work in excess of 40 hours a week and for other current and former nonlicensed Staff 1 and Staff 2 employees of the firm who worked overtime.

When Ms. Sutherland was hired, she was given an offer letter that also provided that "if an employment related dispute arises between you and the firm, it will be subject to mandatory mediation/arbitration under the terms of the firm's alternative dispute-resolution program, known as the Common Ground Program, a copy of which is attached." The arbitration agreement specified that claims arising under state and federal labor statutes, including the federal Fair Labor Standards Act, were subject to the arbitration program. It further specified that any dispute must be brought to arbitration and not to a court, and that all disputes must be brought on an individual basis.

In her lawsuit, Ms. Sutherland attempted to enforce her rights under state and federal minimum-wage and overtime laws. The federal Fair Labor Standards Act has a provision that expressly permits lawsuits for minimum-wage and overtime violations to be brought on a collective basis. Mr. Sutherland sought to use that provision, but to do so, she had to avoid the force of the arbitration clause that said she could only bring a case on an individual basis. To this end, she argued that if she had to arbitrate her claim on an individual basis, it would cost her $160,000 in attorney fees, more than $6,000 in other costs, and more than $25,000 in expert testimony. Overall, she claimed, she would have to spend nearly $200,000 to recover less than $2,000 in unpaid overtime. She argued that because she was unemployed and had substantial college debt, she could not afford to arbitrate on an individual basis, and thus should not be subject to the arbitration provision or the class-action waiver because together they operated to deprive her of rights under the FLSA.

The lower court was sympathetic to Ms. Sutherland's arguments, and held that the class-action waiver did not apply because it would prevent her from vindicating her rights under the Fair Labor Standards Act. However, the U.S. Court of Appeals reversed, relying on the 2013 Supreme Court decision in *American Express Co. v. Ital-*

*ian Colors*, 133 U.S. 2304, an antitrust case, in which the Supreme Court held that a class-action waiver in an arbitration clause was enforceable despite the high cost of bringing an individual action. In that case, Justice Scalia, speaking for the majority, wrote that "the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." On the basis of this precedent, the Court of Appeals denied Ms. Sutherland's right to bring her dispute to a court or arbitration on a collective basis, thereby effectively eliminating her right to overtime pay under the federal statute.

This case is not an anomaly. Rather, it reflects the current law of arbitration and illustrates the difficulties that ordinary workers face when they try to enforce their statutory employment rights. Below we map out the current law of arbitration and then present data on the extent of use of arbitration and the impact of arbitration on the ability of workers and consumers to enforce their rights.

## Where did the arbitration epidemic come from?

The current arbitration epidemic is a result of judicial developments that began in the 1980s, when the U.S. Supreme Court reinterpreted a little-known federal law enacted in 1925 called the Federal Arbitration Act (FAA). The FAA provides that when a dispute involves a contract that has a written arbitration clause, a court *must*, upon motion, stay litigation so that the dispute can go to arbitration.[4] And after an arbitration proceeding is complete, the FAA gives courts extremely limited power to review arbitral awards, no matter how erroneous they might be. Under the statute, an award can only be set aside on four grounds: it was procured by fraud, the arbitrator was biased, the arbitrator refused to hear relevant evidence, or the arbitrator exceeded his or her power as set out in the parties' arbitration agreement. Each of these has been interpreted exceptionally narrowly. There is no provision for overturning an award based on errors of fact, contract interpretation, or law.

Initially, the drafters, commentators, and the courts assumed that the FAA applied only to a narrow range of commercial disputes—those brought in a federal court pursuant to its power to decide issues arising under federal law. However, in the 1980s the U.S. Supreme Court radically expanded the scope of the statute. Today courts interpret the statute to apply to disputes of all types, whether brought in a federal or a state court. Moreover, the Supreme Court has held that the FAA overrides any state law that runs counter to the pro-arbitration policies of the FAA. It is important to recount the path by which this transformation occurred because it shows how entrenched the current interpretation has become and how overwhelming are the obstacles to change under the statute as currently interpreted. This, in turn, explains why new congressional action is necessary.

### The FAA from 1925 to the mid-1980s

Under the common law as it stood in the early 20th century, arbitration agreements were not specifically enforceable, so it was easy for a reluctant party to an arbitration agreement to avoid arbitrating a dispute. To get this changed and make arbitration agreements enforceable, the New York Chamber of Commerce and the American Bar Association's Committee on Commerce, Trade, and Commercial Law mounted a multipronged campaign to overturn the anti-arbitration policies of the common law. They drafted and successfully enacted the New York Arbitration Act of 1920. They then turned to Congress, and drafted the 1925 Federal Arbitration Act and lobbied intensely for its enactment. Their main ally in the battle for the federal statute was the Secretary of Commerce, Herbert Hoover, who saw the bill as fitting into his larger vision of promoting business self-regulation.

The stated purpose of both the New York and the federal statutes was to make written agreements to arbitrate enforceable. The key provision of the federal law, copied from the New York statute, was Section 2, which made written agreements to arbitrate in contracts involving commerce "valid, irrevocable, and enforceable, save on such grounds as exist in law or in equity for the revocation of any contract."[6] Other sections of the statute included a mandatory stay of judicial proceedings and the requirement that courts order parties to arbitrate when disputing parties have a written agreement to arbitrate. The FAA also provided for judicial enforcement of arbitration awards and specified extremely narrow grounds for a court to refuse to do so.

The drafters, legislators, and advocates of the FAA assumed that the statute applied only to business disputes. It was drafted with an eye toward trade association arbitration, not employment or consumer disputes. Indeed, the statute contains a specific exemption for "contracts of employment." Consistent with this understanding, between 1925 and the 1980s, courts interpreted the FAA as applying to a narrow set of cases—commercial cases involving federal law that were brought in federal courts on an independent federal ground. But in the 1980s, the U.S. Supreme Court turned the FAA upside-down through a series of surprising decisions. These decisions set in motion a major overhaul of the civil justice system. It is no exaggeration to call the Supreme Court's arbitration decisions in the 1980s the hidden revolution of the Reagan Court.

### The expanding reach of the FAA after 1985

Between 1985 and 2015, there were more than two dozen Supreme Court decisions in arbitration cases, virtually all of which expanded the scope of the FAA and restricted the ability of states to maintain laws to protect consumers and employees and the ability of individuals to resist costly and unfair arbitration systems. In light of these decisions, the ability of a party to challenge an arbitration clause on the basis of state law has shrunken to a vanishing point.

First, in the 1980s, the Supreme Court adopted a presumption in favor of arbitration to use when deciding cases involving the FAA. It ruled in *Moses H. Cone Memo-*

rial Hospital v. Mercury Construction Corp., 460 U.S. 1 (1983), that when deciding whether a particular dispute comes within an arbitration clause, courts should resolve all doubts in favor of arbitration. It said that such a presumption furthered the "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." This declaration of federal policy has served as a fixture of arbitration law and provided a rationale for the extraordinary expansion of the FAA that followed.

Then, in 1984, in Southland Corp. v. Keating, 465 U.S. 1 (1984), the high court rejected the view that the FAA only applied to cases in federal courts. Rather, the Court held that the FAA also applied to disputes over contracts that were brought in state courts, so long as the dispute involved interstate commerce. The Southland decision was a major expansion of the scope of the statute. Moreover, despite direct evidence in the FAA's legislative history to the contrary, and despite language in Section 2 of the FAA preserving the role of state law to regulate arbitration, the Supreme Court majority held that the statute preempted any state laws with which it conflicted. Thereafter, any state efforts to regulate arbitration would be subject to preemption by the FAA.[7]

A third development of the 1980s concerned the types of disputes that were subject to the FAA. Whereas previously the FAA had been found to apply only to contractual disputes, in 1985, in Mitsubishi Motors v. Soler Chrysler-Plymouth, 473 U.S. 614 (1985), the Supreme Court held that the FAA also compelled arbitration of statutory disputes. Mitsubishi involved a business dispute in which one party alleged a violation of antitrust laws. Two years later, in Shearson/American Express v. McMahon, 482 U.S. 220 (1987), the Supreme Court expanded on its holding to conclude that a dispute involving alleged violations of the anti-racketeering RICO statute (formally called the Racketeer Influenced and Corrupt Organizations Act) and federal securities laws was also subject to an ordinary boilerplate arbitration clause.

The Southland decision on preemption and the Mitsubishi decision on the arbitration of statutory claims in the 1980s vastly expanded the scope of the FAA. In 1991, the Court further expanded the range of statutes whose provisions were subject to arbitration by holding, in Gilmer v. Interstate/Johnson Lane Corp. 500 U.S. 20 (1991), that an employee's allegations that he had been subject to age discrimination in violation of civil rights laws had to be taken to arbitration. Thenceforth, most claims arising under federal statutes would be subject to arbitration. In the decades that followed, the Supreme Court further expanded the scope of the FAA in order to promote the liberal policy in favor of arbitration that it read into the 1925 statute.

At the same time, the Court repeatedly rebuffed attempts by states to enact legislation that would protect consumers and employees from unfair arbitration agreements. Beginning in the late 1980s and through the 1990s the Court struck down legislative efforts by states to protect consumers and employees from oppressive arbitration agreements. One case involved a 1985 Montana law requiring that arbitration agreements in consumer contracts appear on the first page of the contract in reasonable-sized type (Mont. Code Ann. § 27-5-114 (1993)). The purpose of the statute was to ensure that consumers knew that they were consenting to arbitration when they entered into a contractual relationship with a large corporation. In 1992, a Subway franchise owner and his wife in Montana sued, claiming that Subway had defrauded them by refusing to give them the preferred location they had been promised, causing their business to fail and their loan collateral—in this instance, their life savings—to be forfeited. Their franchise agreement with Subway had an arbitration clause that said all disputes must be arbitrated in Connecticut, far from Montana. To travel there and hire a Connecticut lawyer would have been exceedingly costly for the nearly bankrupt Casarottos. Moreover, the arbitration clause did not comply with the requirements of the Montana statutory notice provision: Rather than appearing prominently in the contract,

it had been buried in small type. The Montana Supreme Court refused to enforce the arbitration clause, but the U.S. Supreme Court reversed, holding in *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681 (1996) that the law was restrictive of arbitration and therefore preempted.

The Supreme Court has also made it difficult for consumers or workers to avoid arbitration on the grounds that it would be prohibitively costly for them to take their cases to arbitration. In 2000, in *Green Tree Financial Corp.-Ala. .v Randolph*, 531 U.S. 79, an individual who borrowed money to purchase a mobile home and who was subsequently saddled with exorbitant finance charges sued, claiming that the lender had violated the Truth in Lending Act—a statute intended to protect consumer borrowers from misleading terms in loans. Her loan agreement had a clause requiring an arbitration tribunal that would have imposed costs far beyond her ability to pay. The Supreme Court nonetheless enforced the arbitration clause, despite acknowledging that the projected costs of the arbitration would probably preclude Ms. Randolph from bringing her case at all. The Court said that a party who opposes arbitration on the grounds that it is too expensive to proceed to arbitration had the burden of showing that the costs of arbitration would be prohibitive.

The Court has also further cut back on the ability of consumers and employees to avoid arbitration on the grounds that a contract is illegal, unconscionable, or otherwise not enforceable. One might think that if a contract is unenforceable, a party cannot be required to arbitrate under it because the arbitration clause is part of the unenforceable contract. That was the law until 1967. But in 1967 the Supreme Court held, in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, that when a party claimed that a contract it had signed was induced by fraud, that party had to assert its claim in arbitration. That is, even if the entire contract (in that case, a commercial lease) was invalid, the arbitration clause survived because, the Court found, the promise to

arbitrate was separable from the rest of the contract. This holding is called the "separability doctrine."

In 2006, the Supreme Court in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, extended the separability doctrine to illegal contracts, even though doing so meant that a party had to arbitrate an alleged violation even when the underlying contract that contained the arbitration agreement was entirely void. The only exception the Court recognized was when a party claimed that there was illegality, fraud, or some other recognized contractual defense in the arbitration clause itself.

One of the most frequently raised objections to arbitration clauses is that they are unconscionable. Unconscionability is a well-established contract-law doctrine that says that when a contract is grossly unfair in its terms and/or in the manner in which it was procured, it will not be enforced. Each state has developed its own definition of unconscionability over time. In 2010, in *Rent-A-Center West v. Jackson*, 561 U.S. 63, the Court expanded the separability doctrine in a way that eliminated many unconscionability challenges to arbitration clauses. In that case, the Court held that a party who claimed that the arbitration clause in his employment contract was unconscionable under his state law had to bring that claim to arbitration because the aspect of the arbitration clause he alleged was unconscionable was not the same aspect to which he objected. As Justice Stevens explained in dissent:

> Prima Paint and its progeny allow a court to pluck from a potentially invalid *contract* a potentially valid *arbitration agreement*. Today the Court adds a new layer of severability—something akin to Russian nesting dolls—into the mix: Courts may now pluck from a potentially invalid arbitration agreement even narrower provisions that refer particular arbitrability disputes to an arbitrator [emphasis in original].

In addition to expanding the scope of the FAA, the Court has narrowed the standard of review of arbitral awards, thus restricting the ability of parties to appeal an arbitral decision in court. In 2008, in *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, the Court held that parties cannot agree to have a court review the decisions of their arbitration tribunals. In that case, the parties to a commercial lease had an arbitration agreement that called for arbitration of all disputes but also specified that a court should vacate any award that was not supported by the facts or was based on an erroneous conclusion of law. Although arbitration is said to be a creature of the parties' contract, and the parties are supposed to be able to craft arbitration systems however they like, the Supreme Court refused to enforce the parties' agreement about the scope of review. Rather, it held that the national liberal policy favoring arbitration required limiting judicial review to the specific grounds enumerated in the FAA itself. In dicta, the Supreme Court also disparaged the long-settled principle that courts could refuse to enforce arbitration awards that were "in manifest disregard of the law." Thus, after *Hall Street,* the grounds for attacking an arbitral award have become extremely narrow.

### Supreme Court decisions on arbitration of employment contracts

The arbitration of employment disputes has its own history, although one that parallels the general trends described above. The FAA contains a clause that appears to exclude employment disputes from the statute's coverage. Section 1 of the statute provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Despite this language, in 1991, in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, the Supreme Court applied the FAA to an employment case, ruling that an employee was required to bring his age discrimination complaint to arbitration rather than to a court. The decision was ambiguous about the effect of the statutory exclusion for contracts of employment because, in that case, the arbitration clause was not in a contract between an employee and an employer, but rather was in a contract between an employee and the agency with which the employee was required to register to get the job. The Supreme Court clarified the ambiguity in 2001 in *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, interpreting the exemption for "contracts of employment" exceedingly narrowly. It ruled that the statute applied to all contracts of employment except those involving workers who, like seamen and railroad workers, were engaged in transportation that crossed state lines. Since then, courts have applied the FAA to numerous employment cases.

### Legal issues in arbitration today: Arbitration and class-action waivers

The most controversial issue in arbitration law today grows out of the interaction between arbitration and class actions. Composite arbitration–class-action waivers have become common in contracts offered by credit card companies, banks, cell phone providers, and providers of other common services.[8] They are also used with increasing frequency in employment contracts.[9] Consumers and employees have challenged composite arbitration–class-action waivers on two grounds—that such composite clauses are unconscionable or that they make it impossible to vindicate statutory rights. Some state courts and lower federal courts have refused to enforce these composite clauses on both grounds, but recent decisions by the Supreme Court are calling these decisions into question.

The Supreme Court has addressed the issue of composite arbitration–class-action waivers several times in recent years. In 2011, in *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333 (2011), it held that a California law making class-action waivers in most consumer cases unconscionable was invalid because it was preempted by the FAA. In 2013, in *American Express Co. v. Italian Colors Restaurant,* the Court enforced a class-action waiver even though the plaintiffs had shown that without a class action, it would be impossible for them to vindicate

their legal rights. Although *Italian Colors* was not a labor case, it has significant ramifications for employees' rights under the labor laws. Both these cases will be discussed below.[10]

## Preemption, unconscionability, and class-action waivers

In 2011, in *AT&T Mobility LLC v. Concepcion*,[11] the Supreme Court upheld a class-action waiver in a consumer contract against a challenge that the waiver was unconscionable under California state law. In that case, an AT&T customer brought a class action alleging that the company had engaged in fraudulent practices by charging sales taxes—approximately $15 per phone—to customers promised free cell phones in exchange for a two-year service contract. AT&T's customer agreement included an arbitration clause that also banned class actions and classwide arbitration. The plaintiffs wanted to bring their case as a class action, so they argued that the class-action waiver was unconscionable.

The Ninth Circuit applied California's three-pronged test, which determines that a class-action waiver in a consumer contract is unenforceable if (1) the agreement is a contract of adhesion—i.e., a form contract presented by a powerful party to a weaker party on a take-it-or-leave-it basis, (2) the dispute is likely to involve small amounts of damages, and (3) the party with superior bargaining power carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money. The Ninth Circuit found all three prongs of the test satisfied, and therefore denied AT&T's motion to compel arbitration on an individual basis.[12]

The Supreme Court reversed, holding that the California rule was preempted because it interfered with arbitration. Justice Scalia, writing for the majority, also disparaged the use of class arbitration. He enumerated the reasons he found class arbitration to be an unsatisfactory procedure. He stated that class arbitration would undermine the informality, efficiency, and speed that are the raison d'être for arbitration in the first place. He also stated that

in class arbitration, an arbitrator would have to devise a method to afford absent class members notice, an opportunity to be heard, and a right to opt out. He then stated that class arbitration could impose great risks on defendants, who could receive a devastating judgment when numerous small claims were aggregated and yet would lose their right to interlocutory appeals or judicial review. For these reasons, he concluded that "[a]rbitration is poorly suited to the higher stakes of class litigation."[13]

Some lower courts initially limited the *Concepcion* decision to the consumer setting and refused to extend it to the employment cases, but over time, most courts have extended it.[14] Moreover, although the *Concepcion* case was about preemption of a specific state law, many courts have read it more broadly to disallow all unconscionability challenges to class-action waivers.[15]

## The effective-vindication doctrine

Even though the *Concepcion* decision has been read to preclude most unconscionability challenges to arbitration in the employment setting, there is another line of argument some have used to invalidate waivers of the right to bring collective or class actions. That is the argument that a ban on class litigation would abrogate plaintiffs' substantive statutory rights.

The U.S. Supreme Court has long maintained that arbitration is only appropriate when it entails no loss of substantive statutory rights. The Court first expressed this principle in 1985 in *Mitsubishi Motors v. Soler Chrysler-Plymouth* discussed above, in which the Court held that a party was required to arbitrate a claim arising under the Sherman Antitrust Act.[16] In justifying its decision in *Mitsubishi,* the Court stated that arbitration could be ordered only if the litigant "may vindicate its statutory cause of action in the arbitral forum."[17] The Court further explained that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute."[18]

The effective-vindication-of-substantive-rights principle is essential if courts are to justify closing the courthouse door to otherwise qualified litigants. In a number of consumer and employment cases, plaintiffs have asserted that the enforcement of class-action waivers would force litigants to forgo their substantive rights, and hence that arbitration should not be required.[19] These cases were not controlled by *Concepcion* because, as explained above, the *Concepcion* decision involved a conflict between the FAA and state law, and the Court found the state law to be preempted. In contrast, the effective-vindication doctrine is of primary importance when there is a potential conflict between the FAA and a federal law.

Consumers have raised effective-vindication arguments against arbitration in cases in which it would be prohibitively expensive for them to arbitrate their claims. As we saw above, the Supreme Court has not been sympathetic to these arguments. Employees have raised effective-vindication arguments when arbitration combined with a ban on class actions would extinguish their substantive rights to engage in collective action.

Many effective-vindication cases arise under the Fair Labor Standards Act—a statute that explicitly provides that aggrieved employees can bring a "collective action."[20] Often these cases involved allegations of misclassification—for example, whether employees were improperly termed supervisors and thus improperly determined to be ineligible for overtime payments. In deciding FLSA class-action waiver cases, lower courts have to decide whether the provision in the FLSA statute for bringing "collective actions" is a procedural right or a substantive right. If it is a substantive right, then under *Mitsubishi*, it cannot be waived. Most courts that have considered this issue have held that the right to proceed in a collective action under the FLSA is procedural, and thus the composite arbitration and class-action waiver was required.[21]

While it might be reasonable to see the right to engage in a collective action to be a procedural right in the FLSA

context, the same argument cannot be made concerning class-action waivers in claims arising under the National Labor Relations Act (NLRA). In the NLRA, the right to engage in collective and concerted action is the core right that the statute protects. Yet there is currently an open question as to whether a composite arbitration and class-action waiver clause would deprive workers of their substantive right to engage in collective action under the National Labor Relations Act. In *D.R. Horton, Inc.*, 357 NLRB No. 184 (2012), the National Labor Relations Board took the position that a mandatory arbitration clause in an employment contract that required all actions to be brought on an individual basis interfered with the employee's rights to engage in concerted activity under the labor laws. The *D.R. Horton* decision was overturned by the Fifth Circuit. There are several other similar cases pending in other circuits, and the issue may reach the U.S. Supreme Court.

Although the question raised by *D.R. Horton* has not yet been addressed by the Supreme Court, there is another recent Supreme Court case that bears ominously on the issue. In June 2013, the Supreme Court decided *American Express Co. v. Italian Colors Restaurant*.[22] The case arose when a group of merchants brought a class action alleging that American Express (AmEx) imposed on them an illegal tying arrangement that violated the Sherman Antitrust law. Each of the merchant's contracts with AmEx contained a clause that prohibited the merchant from bringing any dispute to a forum other than arbitration, and required that all disputes be arbitrated on an individual basis. AmEx moved to compel arbitration, and the district court granted the motion. The merchants contended that arbitration of the antitrust claim on an individual basis would cost hundreds of thousands of dollars, whereas the average recovery would be only $5,000. Hence, they claimed, without the ability to bring a class or collective action, they would lose their substantive rights. The Second Circuit agreed.[23]

The Second Circuit decision was overturned by the Supreme Court in June 2013. The Supreme Court upheld the class-action waiver despite irrefutable evidence that the cost of bringing an antitrust case was so high that without the ability to proceed as a class action, the case could not be brought. In doing so, Justice Scalia, writing for the majority, cast doubt on the effective-vindication-of-substantive-rights principle. He called the principle mere "dicta," and stated that, at most, it might apply to "filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable."[24] He wrote, cryptically, "[T]he fact that it is not worth the expense involved in proving a statutory remedy does not constitute the elimination of the right to pursue that remedy."[25]

Justice Kagan delivered a strong dissent in *Italian Colors*. The overall effect of the opinion, she explained, is that "[t]he monopolist gets to use its monopoly power to insist on a contract effectively depriving its victims of all legal recourse."[26] She argued that the effective-vindication rule was essential to prevent stronger parties from using these and other kinds of means to eviscerate statutory protections. As she explained, "The effective-vindication rule [ensures that] arbitration remains a real, not a faux, method of dispute resolution. With the rule, companies have good reason to adopt arbitral procedures that facilitate efficient and accurate handling of complaints. Without it, companies have every incentive to draft their agreements to extract backdoor waivers of statutory rights."[27]

Although the *Italian Colors* case itself involved a dispute brought by merchants, the majority's decision has important consequences for employment cases. By narrowing the effective-vindication doctrine, the Court has potentially undermined challenges to class-action waivers in arbitration clauses. That is, just as *AT&T Mobility* knocked out most unconscionability challenges to unfair arbitration agreements on preemption grounds, *Italian Colors* threatens to eliminate most challenges brought on

the basis of the effective-vindication doctrine. And in doing so, *Italian Colors* suggests that the arbitration law trends may signal the destruction of the legal protection for collective action that has been at the heart of labor laws for over 60 years.[28]

## Other current issues: Severance, interpretation of arbitration agreements, and private attorney general actions

There are two arbitration cases that will be decided by the Supreme Court this term. One, *MHN Government Services, Inc. v. Zaborowski*, concerns whether a court, when presented with an arbitration agreement that is unconscionable in several respects, can invalidate an entire arbitration agreement or whether it must simply sever the unconscionable elements and enforce the rest.[29] The California courts have taken the position that when there are multiple unconscionable aspects to an arbitration clause, it can invalidate the clause in its entirety. This principle is important because it disincentivizes powerful parties from writing arbitration clauses with unduly harsh provisions. If a court would simply sever any unconscionable provision and enforce the rest of an arbitration clause, a powerful party might be tempted to include numerous harsh elements, knowing that even if some are deemed unenforceable, they can still require the counterparty to arbitrate. The principle is being challenged on the grounds that it is an arbitration-specific rule that disfavors arbitration and is therefore preempted by the FAA.

The other arbitration case currently before the Supreme Court involves a state court's ability to interpret arbitration clauses. It has generally been assumed that contract law is a matter of state law, and that it is for state courts, not federal courts, to interpret contracts. In a consumer arbitration class-action waiver case called *DIRECTTV, Inc. v. Imburgia*, an arbitration clause provided that, notwithstanding the arbitration clause, "If, however, the law of your state would find the agreement to dispense with class arbitration procedures unenforceable, then [the entire section requiring arbitration] is unenforceable."[30] The case arose in California at a time when class-action

waivers in consumer contracts of the sort in that contract were held to be unenforceable. Accordingly, the state court refused to enforce the class-action waiver. The Supreme Court has accepted review in order to determine whether the state's own interpretation of the contract conflicts with the FAA and hence should be overturned.

Another issue that is likely to come to the Supreme Court soon involves the waiver of rights under statutes that permit individuals to enforce laws enacted for the public benefit. In 2004, California enacted a statute called the Private Attorney General Act, or PAGA law, to assist in the enforcement of its Labor Code.[31] The purpose of the statute was to permit aggrieved employees to enforce the California Labor Code because the public enforcement agency lacked the resources to achieve maximum compliance with state labor laws.

In 2014, in *Iskanian v. CLS Transport*, a truck driver brought a class-action suit alleging failure to pay overtime and provide rest breaks.[32] In that case, the employee was subject to an employment agreement that contained both an arbitration clause and a waiver of class or representative action. The California Supreme Court found that the waiver was not enforceable as applied to PAGA claims. Relying on the settled proposition that "[a]nyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement," it found that PAGA actions were representative actions and thus the right to bring the suit to a court could not be waived.

The lower federal courts in California have been inconsistent in their willingness to follow *Iskanian* and prevent a compelled waiver of employment PAGA actions. Some lower courts have done so, but many others have rejected *Iskanian* on the grounds that its reasoning and result are inconsistent with *Concepcion*.[33] However, on September 30, 2015, the Ninth Circuit, in a divided opinion, affirmed the result in *Iskanian* and rejected a class-action

waiver of PAGA claims.[34] It is likely that this issue will go to the Supreme Court.

### The future of arbitration law

Arbitration law is a dynamic area of law. Because the Supreme Court decisions have made arbitration the only forum available for resolving disputes in many cases, the particular details of arbitration procedures need to be resolved. Hence the number of cases continues to grow, and new issues are continually arising. However, the trends are clear: Courts will not permit states to constrict arbitration, and they will enforce arbitration agreements in all but the rarest circumstances, no matter how much advantage they give to the stronger parties. In light of these rulings, it is not surprising that the use of arbitration by private-sector businesses and employers has grown enormously.

# How mandatory arbitration works

## The prevalence of mandatory arbitration and class-action waivers

### Arbitration in employment

Until the 1990s, arbitration in employment was almost exclusively a creature of the labor contracts of unionized workplaces. In the unionized setting, labor arbitration provides a jointly established mechanism for enforcing the provisions of collective-bargaining agreements and providing industrial justice in the workplace. Labor arbitration has been one of the most enduring and successful features of the American industrial relations system because it has served the interests of both unions and management, and both parties are equally involved in establishing and administering the system. These arbitration cases are decided by a well-established cadre of professional neutral labor arbitrators whom both parties must consider fair and neutral to be selected to decide cases. By contrast, prior to the 1990s, arbitration was only rarely used in nonunion workplaces precisely because there was no union present to play the insti-

tutional role as the bilateral partner to the employer in establishing arbitration.

The picture of arbitration as a creature of the unionized workplace started to shift as the Supreme Court began allowing statutory employment rights to be subject to arbitration agreements in its 1991 *Gilmer* decision, discussed above. Beyond simply providing for arbitration of statutory claims, *Gilmer* gave the green light to employers to require employees to sign arbitration agreements as a mandatory term and condition of employment. The case and its progeny allowed employers to unilaterally introduce arbitration procedures to cover statutory employment rights and make these procedures mandatory in the sense that the employer would refuse to hire a job applicant who would not sign the arbitration agreement.

Since 1991, arbitration has grown rapidly in nonunion workplaces.[35] Many major corporations now use mandatory arbitration procedures, including Anheuser-Busch InBev, Citigroup, Darden Restaurants, Haliburton, J.C. Penney, Lowes, Oracle, Rent-A-Center, Securitas, Sysco, United Healthcare, and Wells Fargo.[36] As this list suggests, mandatory arbitration now covers a wide range of employees in many different industries.

How many employees are covered by mandatory arbitration procedures? This is a surprisingly difficult question to answer, in part because of the private nature of these arbitration procedures. There is no requirement that employers who require their employees to sign mandatory arbitration agreements report this to a government agency such as the Bureau of Labor Statistics (BLS). Nor are data on the incidence of mandatory arbitration gathered in any of the official government surveys of employers. As a result, while the BLS releases detailed data annually on the extent of union membership and representation, there is no official government estimate of the extent of mandatory arbitration.

In the absence of official government statistics on the extent of mandatory arbitration, our best estimates come from academic surveys that have looked at aspects of this question. The picture they show is one of substantial growth over the 1990s and 2000s. These studies are summarized below.

A 1992 survey of corporate use of dispute-resolution procedures found that only 2.1 percent of the employers surveyed used mandatory arbitration.[37] By comparison, a 1995 GAO survey of 1,448 establishments subject to Office of Federal Contract Compliance Programs (OFCCP) reporting requirements found that 7.6 percent of them had adopted mandatory arbitration procedures covering their employees.[38] More recently, a 2003 survey of 291 employers in the telecommunications industry that one of us (Colvin) conducted found that 14.1 percent had adopted mandatory arbitration procedures.[39] However, since the adopting employers tended to be the larger organizations, 22.7 percent of the nonunion employees in the organizations surveyed were covered by mandatory arbitration procedures. In that survey the focus was on procedures covering typical lower-level employees in the industry, such as customer service workers or technicians.

An important feature of the proliferation of mandatory arbitration procedures is that it has encompassed a broad range of lower-level employees. For example, use of mandatory arbitration is widespread in the retail industry, including in chains such as Macy's and Target. It is also used by many restaurant chains, such as Hooters, the Olive Garden, and Waffle House. If the growth trends have continued since that 2003 survey, it is reasonable to estimate that today, a quarter or more of all employees in nonunion workplaces are subject to mandatory arbitration agreements. Put differently, it is likely that the share of American workers who are subject to employer-initiated mandatory arbitration procedures is twice the rate of the now only 11.1 percent who are union members.[40]

## Arbitration in consumer contracts

Arbitration has become even more common in consumer transactions than in employment. The most comprehensive and recent study of the prevalence of arbitration in consumer transactions was conducted by the Consumer Financial Protection Bureau (CFPB). The Dodd–Frank Wall Street Reform and Consumer Protection Act (Dodd–Frank) that established the CFPB also mandated that it conduct a study of the use of mandatory arbitration clauses in consumer financial contracts. In addition, it empowered the CFPB to issue regulations governing the use of mandatory arbitration in these contracts based on the results of this study.

The CFPB began its study in 2012, released preliminary findings in December 2013, and issued its final report in March 2015. The CFPB's Arbitration Study report documents that mandatory arbitration in consumer financial contracts is widespread and that mandatory arbitration clauses are included in a majority of contracts in many areas of consumer finance. The CFPB study found that credit card issuers representing 53 percent of the total credit card market include mandatory arbitration clauses. For prepaid cards, which tend to be used more by lower-income individuals, 92 percent of agreements include mandatory arbitration clauses. In student loans, 86 percent of the largest private lenders use mandatory arbitration clauses. The study found that in California and Texas over 99 percent of payday loan agreements include mandatory arbitration. Even among checking accounts, where use is lower, banks and credit cards that use mandatory arbitration represent 44 percent of insured deposits. In addition, the rate of use of mandatory arbitration in credit card agreements is likely to be temporarily depressed because the settlement of an antitrust lawsuit required four large banks to cease using mandatory arbitration for three-and-a-half years. Although these banks had not resumed using mandatory arbitration at the time of the study, which immediately followed the expiry of the settlement, if they were to resume using mandatory arbitration, this would raise the usage rate to over 90 percent for credit cards.

Regarding the content of these mandatory arbitration procedures, the most important finding of the CFPB study is that over 90 percent of them expressly prohibit class actions. Given the relatively small amounts of many consumer financial transactions and the similarity across claims, the availability of class actions is a crucial element in providing access to justice for consumer financial claims.

Another important finding of the CFPB study is that most consumers are unaware that they had entered into mandatory arbitration agreements. Three-fourths of the consumers surveyed in the study did not know that their credit card agreement included an arbitration clause. Misunderstandings were also widespread. Fewer than 7 percent of the consumers were aware that they were covered by an arbitration agreement that kept them from suing in court.

The CFPB study makes it clear that arbitration has largely displaced the civil justice system for most of the major transactions of ordinary people. A further question is whether this is a good thing. There is debate among researchers about whether consumers fare better in arbitration than in the courts. Some claim that consumers do better, and some claim the contrary.[41] The evidence involves individual claims, each with its own merits.

The CFPB found that most arbitration agreements in consumer transactions include a class-action waiver. This finding reinforces a 2007 survey that found that the most prominent firms in the telecommunications, credit, and financial service industries routinely insert arbitration clauses into their contracts with consumers (76.9 percent), but rarely use them in their other commercial agreements. (6.1 percent).[42] The authors of the survey opined that corporations preferred to have arbitration clauses in contracts with consumers because the clauses could be coupled with bans on class actions. In a similar

vein, a survey conducted in 2009 by one of the authors of this report, Katherine Stone, found that arbitration was a mandatory term in the service agreements of all four of the largest cell phone companies, five of the eight largest cable companies, six of the nine major credit card companies, and three of four large national retail banks, and that all of the arbitration clauses were accompanied by a ban on class actions.[43] Thus the detrimental impact of arbitration clauses on the ability of consumers to band together to pursue low-value claims seems undeniable. And it is only through collective efforts that consumer and employment rights can truly be protected.[44]

## The arbitration process

Arbitration processes in general involve some form of private tribunal that adjudicates the issue in dispute. Arbitration procedures are typically a simpler, more informal version of court procedures, for example relaxing the formal rules of evidence. Underneath these generalizations, however, there is a great deal of variation in arbitration procedures. Different arbitration procedures vary considerably in their degrees of formality, similarity to court procedures, and amount of due process provided to the participants.

The arbitration agreement itself is the primary source of the rules governing the arbitration process. The parties to this private agreement are generally allowed to write into the arbitration clause whatever rules they wish to govern how disputes will be resolved. In practice this means that the corporation that chooses to make arbitration mandatory for its workers or consumers will write the rules of the procedure, and the worker or consumer will have no choice but to assent if they want to enter into an employment or consumer transaction.

Although corporations are free to craft whatever rules they wish for arbitration, many choose to incorporate by reference the rules of an established arbitration service provider. These arbitration service providers, such as the American Arbitration Association (AAA) or JAMS, will administer the arbitration, providing lists of arbitrators for the parties to select from, hearing rooms in which the arbitration can be conducted, and standard rules or procedures to be followed. Organizations such as the AAA and JAMS are important actors in the arbitration system. While they are established as private nonprofit entities, they are also well-known organizations that are subject to public pressures and provide legitimacy to the arbitration process.

In response to concerns about fairness in mandatory arbitration in the 1990s, a number of interested organizations jointly drafted a Due Process Protocol establishing basic fairness standards to be followed in arbitration. These included such important standards as the right to representation by counsel and disclosure of arbitrator conflicts of interest. However, in many other areas of procedure, such as how much discovery should be provided, the allocation of the arbitrators' fees, and whether arbitration should be mandatory or voluntary, the Due Process Protocol did not provide clear guidance. Despite its limitations, the Due Process Protocol did provide some degree of fairness protections, which were then incorporated into the procedures of both the AAA and JAMS. In some areas these organizations' procedures go beyond the protections provided in the Due Process Protocol. For example, whereas the protocol leaves the allocation of fees issue open, the AAA's employment arbitration rules provide that when arbitration is mandatory (i.e., "employer promulgated"), the employer is required to pay 100 percent of the arbitrator's fees.

The larger service providers administer many, but not all, mandatory arbitration cases. In a 2014 survey of plaintiff attorneys conducted by one of the authors of this report, Alexander Colvin, and Mark Gough of Penn State University, respondents were asked who had administered the most recent mandatory arbitration case they were involved in. The AAA was the largest service provider, administering 50 percent of cases. JAMS was second with 20 percent of cases. Another 15 percent of cases were

administered by other smaller service providers, which have not been subject to the same scrutiny or research attention as AAA or JAMS. Meanwhile a further 15 percent of cases were run on an ad hoc basis with no administering agency at all. In this latter category of ad hoc cases, it is the mandatory arbitration agreement itself that alone provides the rules establishing the procedures for arbitration. While we can look at the procedures of organizations such as the AAA and JAMS as providing some degree of due process protections for employees or consumers required to arbitrate under mandatory procedures, this research suggests that there is a high degree of variation in arbitration processes. The ability of corporations to set the rules of mandatory arbitration allows them, and not the workers or consumers, to choose whether to adopt the procedures of a reputable organization with due process protections or rules that violate basic principles of fairness.

A major new feature of mandatory arbitration agreements in both the employment and consumer settings is the inclusion of waivers of class-action claims. The Supreme Court's 2011 decision in *AT&T v. Concepcion* upholding the enforceability of class-action waivers is fueling the adoption of class-action waivers in arbitration agreements. A corporate-defense law firm recently estimated that the percentage of companies that include arbitration clauses with class-action waivers in their contracts grew from 16 percent in 2012 to 43 percent in 2014.[45]

Class-action waivers appear to be widely used in employment arbitration agreements. In a 2015 survey of 481 practicing employment arbitrators, Colvin and Gough asked the arbitrators about the provisions of the arbitration agreements in cases they had decided. The respondents reported that class-action waivers were included in 52 percent of the agreements in cases they had decided.[46]

Procedures provide only part of the story of how arbitration works. Under established arbitration law, if the arbitration agreement does not specify procedures to be used, then the arbitrator has plenary authority to decide how the case is conducted, with very limited grounds for review. As a consequence, the neutrality and fairness of the arbitrator is a central concern in ensuring the fairness of the arbitral process.

Colvin and Gough's 2015 survey of practicing employment arbitrators provides some insights into who the arbitrators are. Demographic diversity is limited; 74 percent are male and 92 percent are non-Hispanic white. Just under half (49 percent) are full-time neutrals. Most of the part-time neutrals who also serve as arbitrators are practicing attorneys, and these are twice as likely to normally represent employers (61 percent) as employees (30 percent) in their legal practices. Over half (59 percent) of all full- or part-time employment arbitrators had at some point in their career worked as legal counsel representing employers, whereas 36 percent had at some point represented employees or unions. It is certainly possible and indeed often happens that an arbitrator can become a genuine neutral despite having been an advocate representing one side or the other. But it is a major concern that a substantial majority of employment arbitrators come out of backgrounds representing employers.

## Outcomes of mandatory arbitration

Mandatory arbitration is not just a theoretical limitation on worker and consumer rights; it has a major practical impact on the ability of workers and consumers to pursue their legal claims and to win their cases.

### Impact of arbitration on workers' success rates and recovery amounts

Arbitration can be an effective alternative mechanism to the courts for resolving many disputes. Whereas the litigation system is often slow and costly, arbitration systems can be faster and cheaper. For example, labor arbitration has a long track record of success in unionized workplaces and is widely accepted as fair and effective by organized labor and employers. However, for workers and consumers, the question is whether mandatory arbitra-

tion unilaterally introduced by companies can be as effective as the courts at enforcing their statutory rights.

Investigating the outcomes of mandatory arbitration is challenging for researchers. Ideally we would like to conduct a double blind study in which cases are randomly assigned to either litigation or mandatory arbitration and the outcomes compared. However in practice this would be both impracticable and unethical when dealing with people with real cases. Nonetheless, even if we cannot compare randomly assigned cases under litigation with arbitration, we can get some information by looking generally at the outcomes of cases in the two forums and then analyzing similarities or differences between them.

**Table 1** shows the results from a 2011 study comparing overall trial outcomes in mandatory arbitration and litigation. The comparison looks at the outcomes of 1,213 mandatory arbitration cases administered over a five-year period by the American Arbitration Association, the nation's largest arbitration service provider. These are compared with the outcomes of studies of employment discrimination cases in the federal courts and non–civil rights employment cases in state courts.

This comparison supports the idea that arbitration can avoid some of the delays of the litigation system. Whereas the average time to trial is almost two years in either federal or state court, it is just under a year under mandatory arbitration. However, the differences in the outcomes of trials are also stark.

Employee win rates in mandatory arbitration are much lower than in either federal court or state court, with employees in mandatory arbitration winning only just about a fifth of the time (21.4 percent), which is 59 percent as often as in the federal courts and only 38 percent as often as in state courts. Differences in damages awarded are even greater, with the median or typical award in mandatory arbitration being only 21 percent of the median award in the federal courts and 43 percent of the median award in the state courts. The most com-

prehensive comparison comes when we look at the mean or average amount recovered in damages across all cases, including those in which the employee loses and zero damages are awarded. When we make this comparison, we find that the average outcome in mandatory arbitration is only 16 percent of that in the federal courts and 7 percent of that in state courts. While there are additional factors to consider in comparing the two systems, at the outset it is important to recognize that in a simple aggregate comparison, mandatory arbitration is massively less favorable to employees than are the courts.

Evidence suggests that the picture has not changed much since 2011. A 2015 study of federal court employment discrimination litigation by Theodore Eisenberg found that the employee win rate has dipped in recent years to an average of only 29.7 percent.[48] At the same time, another 2015 study found that the employee win rate in employment arbitration had also dipped in recent years, to an average of only 19.1 percent.[49] Research has not shown whether a similar dip in employee win rates has occurred in state courts. Whatever the reason for the declining employee success rate in employment cases, these results indicate that while the gap between federal court and arbitration win rates has decreased, it is still the case that the employee win rate in arbitration is 35.7 percent lower than the employee win rate in federal court.

The data presented above only look at overall differences in outcomes. It is reasonable to wonder how much of the mandatory arbitration–litigation outcome gap is due to factors such as the type of cases reaching the trial stage. After all, most cases filed in court settle before they go to trial. So it is possible that settlement patterns could explain part of the difference between trial and arbitration outcomes.

We do not believe that settlement can explain the difference because both court cases and arbitration cases settle prior to trial or hearing in roughly similar proportions. A major study by Nielsen et al. found a 58 percent settlement rate in federal court employment-discrimination

| TABLE 1 | | | |
|---|---|---|---|
| **Comparison of outcomes of employment arbitration and litigation** | | | |
| | Mandatory employment arbitration (Colvin) | Federal court employment discrimination (Eisenberg and Hill) | State court non-civil rights (Eisenberg and Hill) |
| *Mean time to trial (days)* | 361.5 | 709 | 723 |
| *Employee trial win rate* | 21.40% (n=1,213) | 36.40% (n=1430) | 57% (n=145) |
| *Median damages* | $36,500 | $176,426 | $85,560 |
| *Mean damages* | $109,858 | $394,223 | $575,453 |
| *Mean including zeros* | $23,548 | $143,497 | $328,008 |

**Note:** All damage amounts are converted to 2005 dollar amounts to facilitate comparison.

**Source:** The "Colvin" dataset draws on all employment arbitration cases based on employer-promulgated procedures administered by the American Arbitration Association from January 1, 2003, to December 31, 2007. Data are assembled by Colvin from reports filed by the AAA under California Code arbitration service provider reporting requirements. Alexander J.S. Colvin, "An Empirical Study of Employment Arbitration: Case Outcomes and Processes." *Journal of Empirical Legal Studies* 8(1): 1–23 at 5 (2011). The "Eisenberg and Hill" litigation statistics are reported in Eisenberg, Theodore, and Elizabeth Hill "Arbitration and Litigation of Employment Claims: An Empirical Comparison." *Dispute Resolution Journal* 58(4): 44–55 (2003).

ECONOMIC POLICY INSTITUTE

litigation,[50] while recent research on mandatory arbitration found a 63 percent settlement rate across all employment cases in that forum.[51] It may be that there are some differences in which cases settle, but overall it does not appear that differences in the likelihood of settlement before trial can explain the mandatory arbitration–litigation outcome gap.

Another factor that might explain some of the gap between arbitration and court outcomes is differences in pretrial disposition of cases. Many employment litigation cases are resolved through summary judgment motions. The cases that reach trial are often those that survive summary judgment and as a result represent stronger claims. Traditionally, summary judgment was not used frequently in arbitration. However, that picture is increasingly inaccurate, at least as far as mandatory employment arbitration is concerned.

In their 2014 survey, Colvin and Gough asked plaintiffs' attorneys about their most recent employment cases in litigation and mandatory arbitration.[52] In court, summary judgment motions were filed in 77 percent of the cases. However, and surprisingly, summary judgment motions were also filed in nearly half of the arbitration cases (48 percent). While this gap is not insignificant, summary judgment is more common in arbitration than often recognized. One way of looking at how much impact summary judgment has on outcomes is to compare cases across litigation and arbitration where no summary judgment motion was filed. Given the lack of any summary judgment motion in these cases, any differences between the two forums would not be the result of different use of summary judgment. Looking at this subsample of cases in arbitration and litigation where there was no summary judgment motion, Colvin and Gough found that the win rate was 32 percent lower in mandatory arbitration than in litigation. This result indicates that the gap in outcomes cannot be explained away as an effect of greater use of summary judgment motions in litigation.

It could also be argued that the extra time to reach trial might lead to higher damages in the litigation cases. In employment discrimination cases, an employee who is successful in proving discrimination is entitled to collect

damages for the economic loss suffered, including back pay and front pay. This would include losses from any period of resulting unemployment, taking into account the duty to mitigate losses by searching for and accepting alternate employment. The key point is that the damages are tied to the period of unemployment caused by the discriminatory employment decision, not to the period from taking a claim to trial. But even considering the possibility of some accumulation of additional damages while awaiting trial, for example due to ongoing psychological distress, the damages under litigation so far outstrip the time to trial that they cannot be explained by the time to trial. According to Table 1, the period to trial in litigation is only about twice as long as in arbitration, whereas the average damages in federal court are nearly four times as large and in state court well over five times as large as in mandatory arbitration.

Overall, the data show a very large gap in outcomes between cases in courts and under mandatory arbitration. The most important measure of overall outcomes is the average damages across all cases, including wins and losses so as to take both win rates and damage rates into account. These are the results reported in the final row of Table 1, which indicate that plaintiffs' overall economic outcomes are on average 6.1 times better in federal court than in mandatory arbitration ($143,497 versus $23,548) and 13.9 times better in state court than in mandatory arbitration ($328,008 versus $23,548). These are very large differences in outcomes, and attempts to explain away this gap have been largely unsuccessful.

### Impact of arbitration on workers' access to justice and ability to get attorneys

The mandatory arbitration–litigation gap in outcomes has a direct effect on the ability of individual workers to recover compensation for the injuries they have suffered. The gap also reduces the liability exposure of corporations that adopt mandatory arbitration. However, equally important, the mandatory arbitration–litigation gap has a major impact on the ability of workers to make claims in the first place.

To effectively pursue legal claims, most employees rely on finding an attorney willing to take their case. Although individuals can file claims without using an attorney, few are willing to do so, and their success rates are much lower than those who have legal representation. Nielsen et al. found that only 22.5 percent of employees filing employment discrimination cases in the federal courts were unrepresented, and just over a third of those employees eventually obtained representation by legal counsel before the case was completed.[53] Some have argued that the greater simplicity and lower cost of arbitration would allow more employees to bring cases in that forum without legal representation. But in practice, we find that only 21.1 percent of employment cases in mandatory arbitration are brought by employees without legal counsel.[54]

How do employees obtain legal representation? Given that most consumers and low- or middle-income employees lack the financial resources to pay lawyers' typical hourly rates, the key mechanism for financing representation is the contingency fee, where the plaintiff's attorney receives 30–40 percent of the damages as a fee if successful, but charges no fee if the employee loses. In their study of plaintiffs' attorneys in employment cases, Colvin and Gough found that 75 percent typically represented employees under a contingency-fee arrangement, and a further 17 percent used a hybrid arrangement that combined contingency and hourly fees.

The mandatory arbitration–litigation outcome gap has a significant and pernicious effect on the ability to obtain legal counsel under these contingency-fee arrangements. The plaintiffs' attorney accepting employment cases knows that he or she will lose some of the cases and receive no fee for them, while receiving a fee based on the damages awarded in the successful cases. As a result, attorneys decide whether to accept a case based on their judgment about the likely outcome. But as we have seen, the average outcome is substantially lower in mandatory arbitration than it is for litigation: Damages from arbi-

tration are 16 percent of the average damages from federal court litigation and a mere 7 percent of the average damages in state court. Thus lawyers are reluctant to take cases that are subject to mandatory arbitration. Even if arbitration cases are easier and cheaper to process, the large differences in outcomes can substantially reduce the financial incentive and ability of plaintiffs' attorneys to accept cases brought by employees covered by mandatory arbitration.

In surveying plaintiffs' attorneys about their likelihood of accepting potential cases, Colvin and Gough found just such an effect. Whereas on average plaintiffs' attorneys accepted 15.8 percent of potential cases involving employees who could go to litigation, they accepted about half as many, 8.1 percent, of the potential cases of employees covered by mandatory arbitration. Thus, in addition to producing worse case outcomes than litigation, mandatory arbitration also reduces the likelihood of obtaining the legal representation that will help employees bring a claim in the first place.

### Repeat player advantages in arbitration

In dispute resolution, the advantages accruing to repeat players in the system have long been a concern. A business or other organized group that frequently engages in litigation is likely to have advantages over an individual employee or consumer with no previous experience in resolving disputes.[55] Repeat players have advantages because they gain familiarity with the system and how to operate effectively in it. They may also be able to lobby for changes to the system that benefit them.

One of the advantages of the traditional labor arbitration system in unionized workplaces is that both the company and the union are repeat players in the system. That means that they are both likely to be involved in future cases, have experience with past cases, and are invested in the development of a fair, effective system of dispute resolution. This balanced bilateral system with repeat players on both sides means that an arbitrator who was not a genuine neutral, and instead began to favor one side,

would soon become unacceptable to the other side and not be selected for future cases. This balance between two strong repeat players is a key feature allowing private arbitration systems to function effectively.

In employment and consumer arbitration, the employer is likely to be a repeat player whereas the employee or consumer is likely to be a one-shot player.[56] How then can the advantage of the repeat player be balanced? One possibility is that the legal counsel on each side serves as an effective repeat player in the system. A large sophisticated law firm representing the business could be balanced by an aggressive and sophisticated law firm representing the plaintiff. However, in practice legal representation for employees and consumers is much more fractured and of variable quality than that for businesses, which can generally afford to hire large and sophisticated corporate law firms to defend their cases. In a study of lawyers representing parties to employment arbitration, Colvin and Pike found that 76.6 percent of attorneys representing employers listed employment law as a primary practice area, compared with only 56.7 percent of attorneys representing employees.[57] Furthermore, in that study, 54.6 percent of employers were represented by a law firm that handled multiple cases in the study population, whereas only 10.7 percent of employees were represented by a law firm handling multiple cases. While attorneys and law firms can provide a type of repeat player in arbitration, this result indicates that it is employers who are far more likely than employees to benefit from representation by this type of repeat player.

Do we find repeat-player advantages in the outcomes of mandatory arbitration cases? In a study of 2,802 mandatory employment arbitration cases decided between 2003 and 2014, Colvin, one of the authors of this report, and Gough looked at the relationship between numbers of cases involving the same employer and outcomes.[58] They initially found that as employers were involved in more cases they tended to win more of these cases. This is not surprising and could arise from a range of fac-

tors, such as larger employers having better lawyers, more sophisticated human resource (HR) departments, and better internal systems for dealing with workplace conflicts. However, once they controlled for the number of cases involving the employer, they also found a significant effect for the number of cases in which the employer appeared before the same arbitrator. More specifically, the first time an employer appeared before an arbitrator, the employee had a 17.9 percent chance of winning, but after the employer had four cases before the same arbitrator the employee's chance of winning dropped to 15.3 percent, and after 25 cases before the same arbitrator the employee's chance of winning dropped to only 4.5 percent.[59] The study also found that this negative effect of a long-term employer/arbitrator relationship on an employee's chances of winning was stronger when the employee was self-represented, i.e., when there was no plaintiff lawyer available to balance the employer's repeat-player advantage.

What could explain the repeat-player advantage of employers appearing before the same arbitrator multiple times? One possibility is that arbitrators may feel pressure to rule in favor of the employer to be selected in future cases. Although this would go against arbitrator ethical standards and is something that genuinely neutral arbitrators would consciously resist, part-time or more marginal arbitrators without well-established neutral practices could be subject to greater pressures of this nature. While it is difficult to get firm data on this issue, it is noteworthy that some arbitrators in the recent *New York Times* series on mandatory arbitration admitted that these pressures favor repeat players.[60] Even absent any sort of arbitral bias, more sophisticated repeat-player employers may gain an advantage by getting to know particular arbitrators well and developing an understanding of their decision-making patterns and what types of arguments appeal to them. While this alternative explanation might exonerate arbitrators themselves of bias, it would nevertheless suggest that there is a bias in the system that gives employers an advantage over employees as repeat players in the system.

## The use of arbitration as part of corporate HR

Mandatory arbitration in employment contracts is spreading as companies adopt it as part of their employment policies. Arbitration has become an important tool in the corporate arsenal to defend against legal claims. But it is also part of the overall human resources strategy of many companies and interacts with other HR policies. Most large companies that adopt mandatory arbitration also have internal dispute-resolution procedures to resolve organizational conflicts before they reach arbitration.

One well-known American company that has introduced this type of internal dispute-resolution procedure is Anheuser-Busch.[61] Its dispute-resolution procedure includes mandatory arbitration of employment law disputes. However, the procedure begins with local management review of employee complaints, followed by mediation of any potential legal dispute before the claim proceeds to arbitration. A study of this procedure by Bales and Plowman found that the vast majority of claims are successfully resolved in these earlier stages. From 2003 to 2006, 95 percent of claims were resolved at the initial local review stage. Of the 87 claims that proceeded to mediation over this period, 72, or 83 percent, were successfully resolved at that stage. Ultimately only 15 cases, or 1 percent of the total number of complaints filed under the procedure over the four-year period, reached arbitration. Mandatory arbitration is a part of the Anheuser-Busch procedure, but the overwhelming majority of the claims brought under this system are being effectively resolved through mediation and internal dispute-resolution procedures.

Other companies have adopted more elaborate internal dispute-resolution procedures. The diversified manufacturing company TRW adopted employment arbitration

after an upsurge of litigation in the early 1990s.[62] However, as part of developing a more comprehensive set of internal dispute-resolution procedures, it also introduced local management complaint procedures, peer review panels (in which peers of the complainant sit on a type of workplace jury to decide complaints), and mediation. The range of dispute-resolution options provided employees with alternative ways of resolving complaints. The result was that cases were resolved early in the process, with only 72 cases reaching mediation over the first three years of the program and only three of these cases reaching arbitration. Furthermore, when cases did reach arbitration, TRW set up the procedure to be binding on the company if they lost, but *not* binding on the employee if the company won. As a result, employees retained the right to go to court after arbitration. TRW's procedure is unusual in this respect, but it is a powerful example of the feasibility of resolving employment disputes through effective internal procedures without the necessity of mandatory arbitration procedures that bar employee access to the courts.

These examples show that multipronged dispute-resolution procedures can obviate the need to resort to arbitration under mandatory, binding procedures. However, under current law, the company gets to decide what procedures will be imposed on workers or consumers. The way in which this allows companies to control the legal environment under which they operate was illustrated recently by the conflicts around the ride-sharing company Uber.

There has been a great deal of attention in the courts and the media to the employment status of Uber drivers. The question is, should they be considered employees and thus entitled to the protections of employment law or, as the company alleges, should they be considered independent contractors and not entitled to any employment rights? Despite the publicity, it is less well known that, since 2013, Uber has required its drivers to sign mandatory arbitration agreements. As explained above, the arbitration clause means that a private arbitrator, not a court, will answer the crucial policy question of whether Uber drivers are employees or independent contractors. The question is important not only for Uber drivers, but for other workers in the so-called "gig economy," who provide on-demand services coordinated by entities that maintain service platforms.

In a recent decision, a California state court judge refused to enforce Uber's arbitration agreement on the basis that it was unconscionable.[63] Among the features rendering the agreement unconscionable was that it required the driver to pay half of any arbitrator's fees, creating a major barrier to access for low-income drivers. While the agreement did allow drivers to opt out of the arbitration clause within the first 30 days following signing on to drive for Uber, the opt-out language was buried in fine print toward the end of a long contract, leading the judge to describe it as "illusory because it was highly inconspicuous and incredibly onerous to comply with."[64] Although that judge declined to enforce the arbitration agreements used by Uber in 2013 and 2014, the case is under appeal. In practice Uber can easily redraft the mandatory arbitration agreement to correct the specific deficiencies identified by the judge, thereby making its arbitration agreement enforceable.

The Uber mandatory arbitration procedure requires that all claims be brought individually, not as class actions. As explained above, such a clause is allowable and usually enforceable, thereby preventing Uber drivers from banding together to get their legal claims and status determined, whether by an arbitrator or by a court. In the new world of combined arbitration and class-action waivers, an increasing numbers of workers and consumers are, like Uber drivers, trying to band together to protect their legal rights because to proceed solo would be prohibitively expensive. The status of the Uber class-action ban, as well as the Uber arbitration agreement, is currently on appeal.[65]

# What can be done?

## Arbitration Fairness Act

The most direct way to address mandatory arbitration would be for Congress to amend the Federal Arbitration Act to exempt consumer and employment arbitration, or to provide more protection for consumer and employee rights in arbitration. Whereas state-level legislative action to this effect would almost certainly be preempted by the FAA, legislation passed by Congress would encounter no such problem.

The most prominent effort to deal with mandatory arbitration at the federal level has been the proposed Arbitration Fairness Act (AFA). Although there have been various versions of the statute, the most recent version would amend the FAA to specify that "…no predispute arbitration agreement shall be valid or enforceable if it requires arbitration of an employment dispute, consumer dispute, antitrust dispute, or civil rights dispute."[66]

If enacted, the AFA would effectively eliminate all mandatory arbitration in the employment or consumer realms, as well as in antitrust and civil rights cases. In its statement of congressional findings, the proposed AFA specifically refers to the problems of employees and consumers having little effective choice about entering mandatory arbitration agreements, the deleterious effect on the development of public law, and the lack of judicial review.[67]

The Arbitration Fairness Act has been repeatedly introduced in Congress, with versions proposed in 2009, 2011, and 2013. Most recently, the AFA was again proposed in 2015 by Sen. Al Franken (D-Minn.) and Rep. Hank Johnson (D-Ga.). However, it has not received a vote, and passage in the current Congress appears unlikely.

## The Franken Amendment and the Fair Pay and Safe Workplaces Executive Order

In the absence of general action addressing mandatory arbitration, more progress has been achieved on specific limitations. In 2009, Franken successfully amended the annual Department of Defense Appropriations Act of 2010 to address the use of mandatory arbitration by defense contractors. The specific case motivating the amendment involved serious allegations of sexual assault, harassment, and discrimination of a female employee of Halliburton. The Franken Amendment barred any defense contractor with over $1 million in contracts from enforcing a mandatory arbitration agreement in any case involving claims under Title VII of the Civil Rights Act or tort claims relating to sexual assault or harassment. The Franken Amendment is a substantial restriction on the use of mandatory arbitration by defense contractors, but is limited to that sector and applies only to the limited set of claims specified in the amendment. For example, the amendment does not restrict use of mandatory arbitration for other statutory claims such as wage and hour claims under the Fair Labor Standards Act or any claims based on state employment statutes.

The approach taken in the Franken Amendment was subsequently extended to all federal contracts through the Fair Pay and Safe Workplaces Executive Order of 2014 (the FPSW order). The FPSW applies to all federal contractors with contracts of greater than $1 million. Similar to the Franken Amendment, it bars these contractors from enforcing mandatory arbitration agreements in claims based on Title VII or tort claims involving sexual assault or harassment. Although the FPSW is an important extension of the Franken Amendment to a broader set of employers, it suffers from the same limitation in that it applies only to a limited subset of potential employment cases. A federal contractor subject to the FPSW could continue to require its employees to sign mandatory arbitration agreements and simply decline to enforce the agreement for Title VII and the specified tort claims, while retaining the ability to use mandatory arbi-

tration as a shield against litigation based on FLSA, state laws such as the state antidiscrimination and wage and hour statutes, or other claims. A further limitation of the FPSW order is that it may well be subject to legal challenge on the basis that it contradicts the provisions of the FAA (as a statutory measure, the Franken Amendment would not be subject to this same argument).

### Consumer Financial Protection Bureau

As discussed earlier, the Consumer Financial Protection Bureau has conducted a study of mandatory arbitration in the consumer financial industry as required by the Dodd–Frank Wall Street Reform and Consumer Protection Act. In addition to mandating this study, Dodd–Frank also gives the CFPB authority to restrict or ban mandatory arbitration in consumer financial contracts. The CFPB is considering whether to ban class action waivers in mandatory arbitration agreements based on the results of its study. If it does ban the use of mandatory arbitration, this would eliminate the practice in the consumer-finance industry and have a major impact on credit card and other consumer debt contracts.

While the potential action by the CFPB could have a major salutary effect in the consumer-finance contracts field, it is important to recognize the limits of its authority. Action by the CFPB would not extend to employment contracts. Nor would it extend to other types of consumer contracts. So whereas mandatory arbitration clauses might disappear from credit card contracts, they would still exist in restaurant employee contracts, software purchase agreements, medical services contracts, Uber driver agreements, and many other agreements that affect American consumers and workers on a daily basis.

## Conclusion

In the past three decades, the Supreme Court has engineered a massive shift in the civil justice system that is having dire consequences for consumers and employees. The Court has enabled large corporations to force

customers and employees into arbitration to adjudicate practically all types of alleged violations, including violations of laws to prevent consumer fraud, unsafe products, employment discrimination, nonpayment of wages, and countless other state and federal laws designed to protect citizens against corporate wrongdoing. By delegating dispute resolution to arbitration, the Court now permits corporations to write the rules that will govern their relationships with their workers and customers and design the procedures used to interpret and apply those rules when disputes arise. Moreover, the Court permits corporations to couple mandatory arbitration with a ban on class actions, thereby preventing consumers or employees from joining together to challenge systemic corporate wrongdoing. As one judge opined, these trends give corporations a "get out of jail free" card for all potential transgressions. These trends are undermining decades of progress in consumer and labor rights.

It is difficult to know the practical impact of the courts' broad delegation of dispute resolution to arbitration because arbitration is private and arbitration decisions are not generally published. However, research suggests that consumers and employees are less likely to win their cases when they are heard in arbitration, and when they do win, the amounts of damage awards are far less than would be forthcoming in a court. Moreover, there is considerable evidence that individuals who have suffered from corporate wrongdoing are deterred from bringing their claims altogether because arbitration can be too expensive and the results too risky for individual consumers or workers to undertake. The ban on class actions in particular makes it unlikely that many claims of corporate wrongdoing—particularly those that involve small sums for each in large groups of individuals—will ever be heard. As Justice Breyer opined, "Only a lunatic or a fanatic sues for $30."[68]

In the few years since the Supreme Court upheld the use of class-action bans coupled with arbitration clauses, this type of composite clause has become ubiquitous in

the small print governing employment, credit cards, cell phones, bank accounts, Internet providers, and countless other types of everyday transactions. The increase of arbitration clauses that require the losing party to pay the winning party's costs, including attorney fees, will have an even more profound dampening effect on the ability of ordinary citizens to have their day in court.

What can be done to reverse these trends? Arbitration providers tout their voluntary efforts to ensure that arbitration provides due-process protections and unbiased decision-makers. However, while voluntary efforts by arbitration service providers and corporations to enhance due process in their arbitration procedures are desirable, they do not address the fundamental problem that the current law of arbitration allows the corporation to decide what type of arbitration procedure to impose on its employees or customers. Voluntary measures cannot prevent corporations that want to protect their interests—at the expense of employees and customers—from introducing provisions such as class-action waivers and loser-pay clauses that cut off access to justice. Nor can they adequately police against repeat-player bias.

Some courts and state legislatures have tried to oppose the radical change in the civil justice system, but to little avail. The Supreme Court has stated that the Federal Arbitration Act embodies a liberal federal policy in favor of arbitration, and that the act must be applied by state and federal courts. The Court repeatedly holds that the act overrides any state law or judicial doctrine that obstructs arbitration.

In addition to efforts at the state level, two federal agencies are attempting to curtail the use of arbitration by large corporations to deprive consumers and employees of their legal rights. The Consumer Financial Protection Bureau is considering a ban on class action waivers in mandatory arbitration in consumer financial transactions. By focusing on this issue, the CFPB has attracted a response from the U.S. Chamber of Commerce, which has launched a well-funded campaign to curtail the

CFPB's powers and possibly defund it altogether. At the same time, the National Labor Relations Board is attempting to curtail the use of class-action-barring arbitration agreements in the employment setting on the grounds that such agreements interfere with the core principle of labor law—employees' rights to engage in concerted action for mutual aid and protection. However, to date, the Courts of Appeals have rejected the NLRB's reasoning.

Despite the laudable efforts of the Consumer Financial Protection Bureau and the NLRB to protect consumers and employees from arbitrations, the legal trends suggest that agency action on this front will very likely be struck down. As a result, the only way to reverse these trends is to amend the statute itself.

The Arbitration Fairness Act currently before Congress is the best hope for stopping these trends and restoring justice to ordinary citizens. It is crucial that this act get the support of everyone who believes that consumer and employee rights are important and worth protecting.

—*Katherine V.W. Stone is the Arjay and Frances Fearing Miller Distinguished Professor of Law at the UCLA School of Law. Alexander J.S. Colvin is the Martin F. Scheinman Professor of Conflict Resolution at Cornell University.*

## Endnotes

1. The history of the Arbitration Coalition is recounted in Ross v. American Express, 35 F. Supp. 3d 407 (S.D.N.Y. 2014) (failing to find antitrust liability despite the banks' concerted efforts to promote class action barring arbitration clauses), *aff'd sub nom*, Ross v. Citigroup., ___ F.3d ___ (Case No. 14-1610, 2d. Cir., Nov. 19. 2015).

2. Sutherland v. Ernst & Young, 726 F.3d 290 (2d Cir. 2013).

3. Pub. L. No. 75-718, 52 Stat. 1060 (1938) (codified as amended at 29 U.S.C. §§ 201–219 (2006)).

4. 9 U.S.C. § 3. In order to come under the FAA, an agreement must involve commerce and include a written arbitration clause. 9 U.S.C. § 2.

5. The history and vision behind the enactment of the FAA is presented in Katherine V.W. Stone, "Rustic Justice: Community and Coercion Under the Federal Arbitration Act," *North Carolina Law Review* 77: 931 (1999).

6. 9 U.S.C. Sec. 2.

7. The holding in *Southland* was reinforced and expanded in *Perry v. Thomas* in 1987 482 U.S. 483 (1987).

8. See Katherine V.W. Stone, "Procedure, Substance, and Power: Collective Litigation and Arbitration of Employment Rights," *UCLA Law Review Discourse*: 61, 164 (2013).

9. See e.g., O'Conner et al. v. Uber Technologies, Inc. et al., (N.D. Calif. 2015); Mohamed v. Uber Technologies, Inc., (N.D. Calif., 2015).

10. There is another controversial issue that arises when parties are precluded from bringing a class action by virtue of an enforceable class-action waiver and they seek to arbitrate their claim on a class-wide basis. Courts agree that parties are free to specify whether their arbitration clause permits a class arbitration proceeding and if they do so, their intent will be controlling. However, in the majority of situations, an arbitration clause doesn't say anything about the availability of class-wide arbitrations. Courts have been divided on what should be the default rule when a contract is silent about the availability of class arbitration. See, generally, Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010). Courts are also divided on the predicate issue of whether a court or an arbitrator should decide whether the parties' agreement did or did not intend to permit class arbitration.

11. 563 U.S. 333 (2011).

12. Laster v. AT&T Mobility LLC, 584 F.3d 849, 855 (9th Cir. 2009), *rev'd sub nom. Concepcion*, 131 S. Ct. 1740.

13. Id. at 1752.

14. See Tory v. First Premier Bank et al., No. 10-C-7326, 2011 WL 4478437 (N.D. Ill. Sept. 26, 2011); Sanchez v. Valencia Holding Co., 132 Cal. Rptr. 3d 517 (Ct. App. 2011); see also Jerett Yan, "A Lunatic's Guide to Suing for $30: Class Action Arbitration, the Federal Arbitration Act

and Unconscionability After AT&T v. Concepcion," *Berkeley Journal of Employment and Labor Law*: 32, 551, 559–61 (citing cases).

15. See, e.g., Chen-Oster v. Goldman, Sachs & Co., 785 F.Supp.2d 394 (2011) (S.D.N.Y. 2011); Owen v. Bristol Care, Inc., 702 F.3d 1051 (8th Cir., 2013).

16. Id. at 640.

17. Id. at 637.

18. Id. at 628.

19. See, e.g., Sutherland v. Ernst & Young LLP, 768 F. Supp. 2d 547, 554 (S.D.N.Y. 2011) (holding that a clause barring class actions was unenforceable because it would require plaintiffs to forgo their substantive rights). But see Banus v. Citigroup Global Mkts., Inc., 757 F. Supp. 2d 394 (S.D.N.Y. 2010) (enforcing class action waiver).

20. See 29 U.S.C. § 216(b).

21. See, e.g., Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359 (11th Cir. 2005); Carter v. Countrywide Credit Industries, Inc., 362 F.3d 294 (5th Cir. 2004); Adkins v. Labor Ready, Inc., 303 F.3d 496 (4th Cir. 2002). But see Raniere v. Citigroup, 827 F. Supp. 2d 294 (D. Conn. 2003) (refusing to enforce waiver of class action in a Fair Labor Standards Act action).

22. 133 S. Ct. 594 (2013).

23. *In re* Am. Express Merchs.' Litig., 554 F.3d 300, 320 (2d Cir. 2009), *vacated sub nom.* Am. Express Co. v. Italian Colors Rest., 130 S. Ct. 2401 (2010), *remanded to sub nom. In re* Am. Express Merchs.' Litig, 634 F.3d 187 (2d Cir. 2011), *aff'd on reh'g*, 667 F.3d 204 (2d Cir. 2012), *cert. granted sub nom. Am. Express Co.*, 133 S. Ct. 594.

24. Slip Op at 6-7 (Opinion of the Court).

25. Id.

26. Slip Op at 1 (J.Kagan dissenting).

27. Id. at 5.

28. See Yan, *supra* note 14 at 552 (noting that "[t]he unavailability of the class proceedings would have dire ramifications on employees seeking to vindicate their rights").

29. The lower court opinion is at 936 F. Supp. 2d 1145 (ND Calif. 2013).

30. The lower court opinion is at 225 Cal.App.4th 338 (2014).

31. Stats. 2003, ch. 906, § 1

32. The lower court opinion is at 173 Cal. Rptr. 3d 289.

33. See Nanavati v. Adecco USA, Inc., 2015 WL 1738152 (N.D. Calif. 2015), summarizing California lower court PAGA waiver cases after *Iskanian*.

34. Sakkab v. Luxottica Retail North America, slip. op. No. 13-55184 (9th Cir., September 28, 2015), reported in *National Law Journal*, October 5, 2015.

35. See Alexander J.S. Colvin, "Empirical Research on Employment Arbitration: Clarity amidst the Sound and Fury?" *Employee Rights and Employment Policy Journal*, 11(2): 405–447 (2008).

36. Although there is no public registry listing all the companies that require mandatory arbitration of their employees, the disclosure statements that arbitration service providers are required to make public include the names of the companies involved. The most complete and extensive case disclosures currently available are those provided by the American Arbitration Association: https://www.adr.org/aaa/faces/aoe/gc/consumer.

37. See Peter Feuille and Denise R. Chachere, "Looking Fair and Being Fair: Remedial Voice Procedures in Nonunion Workplaces." *Journal of Management* 21: 27–36 at 31 (1995).

38. Although the GAO survey initially found that 9.9 percent of respondents had adopted mandatory arbitration, when the agency followed up with the respondents to obtain copies of their procedures, a number indicated that they did not actually have mandatory employment arbitration and had made errors in their responses. When that correction is made, only 7.6 percent of the respondents remain as

mandatory arbitration adopters. See General Accounting Office, *Employment Discrimination: Most Private Sector Employers Use Alternative Dispute Resolution*, GAO/HEHS 95-150, (1995).

39. Alexander J.S. Colvin, "Empirical Research on Employment Arbitration: Clarity Amidst the Sound and Fury?" *Employee Rights and Employment Policy Journal*: 11(2): 405–447 (2008).

40. "Union Members–2014," Bureau of Labor Statistics (2015).

41. See generally, Sarah Randolph Cole, "Of Babies and Bathwater: The Arbitration Fairness Act and the Supreme Court's Recent Arbitration Jurisprudence." *Houston Law Review*, 48(3): 457–506 at 471–476 (2011).

42. Theodore Eisenberg, Geoffrey Miller, and Emily Sherwin, "Arbitration's Summer Soldiers," *University of Michigan Journal of Law Reform* 41(4): 871–896 at 886 (2008).

43. Katherine V.W. Stone, "Signing Away Our Rights," *The American Prospect* (April 2011) 20.

44. Katherine V.W. Stone, "Procedure, Substance, and Power: Collective Litigation and Arbitration of Employment Rights," *UCLA Law Review Discourse* 61: 164–181 (2013).

45. Carlton Fields Jorden Burt, *The 2015 Carlton Fields Jorden Burt Class Action Survey: Best Practices in Reducing Risk and Managing Cost in Class Action Litigation.*

46. Alexander J.S. Colvin and Mark D. Gough, *Understanding the Professional Practices and Decision-Making of Employment Arbitrators.* Report to the National Academy of Arbitrators Research and Education Fund (2015).

47. Notes: All damage amounts are converted to 2005 dollar amounts to facilitate comparison.

The "Colvin" dataset draws on all employment arbitration cases based on employer-promulgated procedures administered by the American Arbitration Association from January 1, 2003, to December 31, 2007. Data are assembled by Colvin from reports filed by the AAA under California Code arbitration service provider reporting requirements. Alexander J.S. Colvin, "An Empirical Study

of Employment Arbitration: Case Outcomes and Processes." *Journal of Empirical Legal Studies* 8(1): 1–23 at 5 (2011).

The "Eisenberg and Hill" litigation statistics are reported in Eisenberg, Theodore, and Elizabeth Hill "Arbitration and Litigation of Employment Claims: An Empirical Comparison." *Dispute Resolution Journal* 58(4): 44–55 (2003).

48. Theodore Eisenberg, "Four Decades of Federal Civil Rights Litigation." *Journal of Empirical Legal Studies* 12: 4–28 (2015).

49. Alexander J.S. Colvin and Mark D. Gough, "Individual Employment Rights Arbitration in the United States: Actors and Outcomes." *ILR Review* 68(5): 1019–1042 (2015).

50. Laura Beth Nielsen, Robert L. Nelson and Ryon Lancaster, "Individual Justice or Collective Legal Mobilization? Employment Discrimination Litigation in the Post Civil Rights United States," *Journal of Empirical Legal Studies* 7(2): 175–201 (2010).

51. Colvin and Gough (2015), supra note 49.

52. Alexander J.S. Colvin and Mark D. Gough, *Comparing Mandatory Arbitration and Litigation: Access, Process, and Outcomes*. Report to the Robert L. Habush Endowment of the American Association for Justice (2014).

53. Nielsen et al. (2010) supra at 200.

54. Colvin and Gough (2015) supra at 1030.

55. Marc Galanter, "Why the 'Haves' Come Out Ahead: Speculations on the Limits of Legal Change." *Law and Society Review* 9(1): 95–160 (1974).

56. The problem of repeat-player effects in mandatory arbitration was first raised in a series of studies by Lisa Blomgrem Amsler (formerly Bingham), e.g., Lisa B. Bingham, "Employment Arbitration: The Repeat Player Effect," *Employee Rights and Employment Policy Journal* 1(1): 1–38 (1997); Lisa B. Bingham, "On Repeat Players,

Adhesive Contracts, and the Use of Statistics in Judicial Review of Employment Arbitration Awards." *McGeorge Law Review* 29(2): 223–259 (1998).

57. See Alexander J.S. Colvin and Kelly Pike, "Saturns and Rickshaws Revisited: What Kind of Employment Arbitration System has Developed?" *Ohio State Journal on Dispute Resolution* 29(1): 59–83 at 70 (2014).

58. See Colvin and Gough (2015), supra note 69.

59. Ibid at 1033–34.

60. Jessica Silver-Greenberg and Michael Corkery, "In Arbitration, a 'Privatization of the Justice System,'" *New York Times*, Nov. 1, 2015, p. A1.

61. See: Richard A. Bales and Jason N.W. Plowman, "Compulsory Arbitration as Part of a Broader Dispute Resolution Process: The Anheuser-Busch Example" *Hofstra Labor & Employment Law Journal*, 26(1): 1–32 (2008).

62. Alexander J.S. Colvin, "Adoption and Use of Dispute Resolution Procedures in the Nonunion Workplace." *Advances in Industrial & Labor Relations*, 13: 80–94 (2004).

63. Joel Rosenblatt, "Uber Loses Bid to Force Arbitration on California Driver," *BloombergBusiness*, Sept. 21, 2015.

64. Carolyn Said, "Judge Rejects Uber Forced-Arbitration Clause; 2 Cases Proceed," *San Francisco Chronicle*, June 10, 2015.

65. O'Connor v. Uber Technologies, Inc. et al.: Mohamed v. Uber Technologies

66. Section 3(a), Proposed "Arbitration Fairness Act of 2015," H.R. 2087.

67. Section 2, AFA.

68. Justice Breyer, dissenting in *AT&T Mobility LLC v. Concepcion*.

# EXHIBIT 2

# THE FAIRNESS PROBLEM: MANDATORY ARBITRATION IN EMPLOYMENT CONTRACTS

JANNA GIESBRECHT-MCKEE*

TABLE OF CONTENTS

I. INTRODUCTION .......................................................................259
II. THE GROWTH OF MANDATORY ARBITRATION CLAUSES IN
    EMPLOYMENT AGREEMENTS ....................................................261
III. EMPLOYERS AND EMPLOYEES: PLAYERS IN THE MANDATORY
    ARBITRATION CONTROVERSY ..................................................265
IV. ANALYSIS: THE FAIRNESS PROBLEM IN MANDATORY
    EMPLOYMENT ARBITRATION ...................................................267
    A. The Employer/Employee Power Imbalance....................267
    B. Whoever Pays the Piper Calls the Tune: The Repeat
       Player Bias....................................................................269
    C. The Inclusion of Statutory Rights Hurts the Powerless...271
V. SOLUTIONS AND THE FUTURE OF THE MANDATORY
    EMPLOYMENT ARBITRATION PROBLEM.......................................274
VI. CONCLUSION.........................................................................275

## I. INTRODUCTION

Jane was over-the-moon excited to get a phone call from the advertising firm where she had recently interviewed for a position as a graphic designer.[1]  Since graduating from college she had sent out over two hundred applications, and finally she had a job. Jane would now have health insurance, a steady check for rent, and could stop

---

\* Willamette University College of Law, J.D. expected 2014; George Fox University, B.A. 2008.  Thanks are due to Professor Keith Cunningham-Parmeter for inspiring my interest in employment law.  I would also like to thank the Willamette Law Review Board for their helpful comments and Alex Giesbrecht for his constant support.  I can be reached at jgiesbre@willamette.edu.

1. This story is fictitious and is a compilation of the author's experience with employment and various cases.

259

dodging phone calls from the student loan collectors.

The first day on the job, Jane received a fat employee handbook, went through various trainings, met every co-worker in the building, and signed form after form. She barely read them. She saw an "agreement to arbitrate" in her employment contract and didn't ask about it. Jane knew even if she understood arbitration, she had no method of removing the clause. Like her salary and benefits, Jane recognized she had no bargaining power; she was aware of her own desperation, and knew the firm also understood it. There were hundreds of other unemployed graphic designers who would gladly take her place.

Four months into the job, Jane's boss began asking her out on dates. When she turned him down, he started sending provocative emails. She ignored the unwanted advances until he began lurking near her cubicle and car. Jane then filed a claim for sexual harassment with human resources. Two days later Jane received notice—the company had fired her without stating cause.

Jane found a lawyer and sued the company for sexual harassment and retaliatory discharge. The company moved to dismiss, citing the mandatory arbitration clause in her employment contract. When the case was removed to arbitration, Jane and her lawyer received a list of arbitrators; out of the ten, one was a woman and the rest were men over the age of sixty. In peremptory challenges, the firm struck the female arbitrator.

The process that followed shocked Jane. The arbitrator was so familiar with her former boss that he asked about her boss' children by name. Jane's lawyer complained about the limited discovery in proving the sexual harassment claim. After the long, painful process was over, the arbitrator ruled in favor of the employer. Jane left without a job, feeling robbed of her day in court. She couldn't understand how her employer, the party who had always held the power, was able to force her to comply with a system that favored the company.

Mandatory arbitration clauses are everywhere. Most Americans have signed agreements to arbitrate, whether they know it or not. These agreements appear in a wide variety of contracts: in credit card and banking agreements, as part of the plethora of forms signed at a doctor's office, and in employment contracts, to name a few. Many Americans do not understand what arbitration is, and cannot fully comprehend the rights they are relinquishing when signing these contracts.

This Paper focuses on the unfairness of mandatory arbitration clauses in employment contracts. Mandatory arbitration clauses in employment contracts are unfair for several reasons. First, there is an inherent power imbalance between employers and employees that results in unconscionable contracts and an agreement that is far from a bargained-for exchange. The current recession and many employees' desperate need to gain or retain employment make this power balance particularly acute. Second, there is a structural imbalance in arbitration because arbitrators are biased toward the repeat player, the employer. Whether this is a subconscious or overt preference, the numbers show that employers fare better in arbitration and employees receive lower judgments in arbitration. Third, mandatory arbitration agreements' inclusion of statutory rights unfairly burdens the parties Congress intended to protect in Title VII of the Civil Rights Act of 1964 and other anti-discriminatory statutes. Congress enacted this legislation to punish and deter discrimination, yet arbitration fails to adequately punish or deter discriminatory practices. In addition, the groups these mandatory arbitration clauses harm are those Congress meant to protect because of their lack of power.

I will first look at the background of employment arbitration and the U.S. Supreme Court (Court) cases that led to employment arbitration's current hallowed status. Next, I will examine the parties in this controversy—employers and employees—and discuss why employers want mandatory arbitration clauses, the ways employees benefit from arbitration, and why these agreements still are harmful to employees. I will then analyze the fairness of mandatory arbitration clauses in employment contracts. Particularly, I will focus on the power imbalance between employers and employees, arbitrators' bias towards employers as repeat players, and the egregiousness of the agreements' inclusion of statutory rights. Finally, I conclude by briefly examining measures to make arbitration fairer, particularly the Arbitration Fairness Act.

## II. The Growth of Mandatory Arbitration Clauses in Employment Agreements

In 1925, Congress enacted the Federal Arbitration Act (FAA)[2] in an effort to place arbitration agreements "upon the same footing as

---

2. Pub. L. No. 68-401, § 213, 43 Stat. 883 (reenacted July 30, 1947, § 392, 61 Stat. 670, codified as amended at 9 U.S.C. §§ 1–16 (2000)).

other contracts"[3] and to undo judicial antagonism towards arbitration.[4] Congress' primary motivation behind enacting the FAA was to "enforce agreements into which parties had entered."[5] Section 2 of the FAA provides the primary authorization for the enforcement of arbitration clauses, stating that arbitration agreements are enforceable, "save upon such grounds as exist at law or in equity for the revocation of any contract."[6]

The Court has expressly found that under the FAA, Congress "declared a national policy favoring arbitration."[7] The Court has "rigorously upheld" arbitration clauses' enforceability and has unwaveringly preferred "resolving difficult questions in favor of arbitration."[8] The Court's endorsement of arbitration has been so powerful that some have criticized it for being "too extreme in its enthusiasm for arbitration."[9]

Employment arbitration arises from a contract between an employer and an employee.[10] The Court's support of mandatory arbitration clauses in employment agreements in the past two decades has bolstered employers' use of them.[11] In 1991, the Court ruled on

---

3. H.R. REP. NO. 68-96, at 2 (1924).

4. Stephen J. Ware, *The Effects of* Gilmer: *Empirical and Other Approaches to the Study of Employment Arbitration,* 16 OHIO ST. J. ON DISP. RESOL. 735, 737 (2001).

5. Volt Info. Scis., Inc. v. Bd. Of Trs., 489 U.S. 468, 478 (1989) (quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 220 (1985)).

6. 9 U.S.C. § 2 (2000). Section 2 states in full:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*Id.*

7. Southland Corp. v. Keating, 465 U.S. 1, 10 (1984).

8. David S. Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in the Ages of Compelled Arbitration,* 1997 WIS. L. REV. 33, 54, 82 (1997).

9. Kristin McCandless, Note, Circuit City Stores, Inc. v. Adams: *The Debate over Arbitration Agreements in the Employment Context Rages On,* 80 DENV. U. L. REV. 225, 228 (2002). David Schwartz argued that the Court's "enthusiastic approval" of pre-dispute arbitration clauses created a "monster." Schwartz, *supra* note 8, at 82.

10. Ware, *supra* note 4, at 737. Employment arbitration is often confused with labor arbitration. Labor arbitration arises out of a collective bargaining agreement between a union and an employer. *Id.*

11. Ashley M. Sergeant, *The Corporation's New Lethal Weapon: Mandatory Binding Arbitration Clauses,* 57 S.D. L. REV. 149, 149 (2012) ("Since 1998, the Supreme Court has

*Gilmer v. Interstate/Johnson Lane Corp.*[12] and "reversed a longstanding presumption that employment claims were exempt from the FAA."[13]

*Gilmer* involved an employer (Interstate), who required its employee (Gilmer) to register as a securities representative with the New York Stock Exchange.[14] Part of the registration form contained an agreement to arbitrate "[a]ny controversy between a registered representative and any . . . member organization arising out of the employment or termination of employment of such registered representative."[15] When Interstate fired Gilmer at age 62, Gilmer filed suit, alleging his discharge violated the Age Discrimination in Employment Act of 1967 (ADEA).[16] Interstate moved to compel arbitration of the ADEA claim, relying on the arbitration agreement in Gilmer's registration application.

The Court found for the employer and in the process established important rules for employment arbitration.[17] The first was a clear-cut endorsement of the arbitrability of statutory claims in employment agreements.[18] The Court rejected the argument that arbitration was inferior to a judicial remedy and stated, "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial forum."[19] In addition, the Court found no inconsistency between the "important social policies" of the ADEA and the enforcement of arbitration agreements.[20]

The Court also "rejected a number of arguments about arbitration's intrinsic unfairness"[21] and called these complaints "far out of step with [the Court's] current strong endorsement of the

---

issued opinions that have greatly expanded corporations' use of mandatory binding arbitration clauses.").

   12. 500 U.S. 20 (1991).

   13. *Id.* at 35; Kenneth F. Dunham, *Great Gilmer's Ghost: The Haunting Tale of the Role of Employment Arbitration in the Disappearance of Statutory Rights in Discrimination Cases*, 29 AM. J. TRIAL ADVOC. 303 (2006).

   14. *Gilmer*, 500 U.S. at 23.

   15. *Id.*

   16. *Id.* at 23–24.

   17. *Id.* at 35.

   18. *Id.* at 26.

   19. *Id.* at 26 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc. 473 U.S. 614, 631 (1985)).

   20. *Id.* at 27–28.

   21. McCandless, *supra* note 9, at 229.

federal statutes favoring this method of resolving disputes."[22]   The Court brushed off Gilmer's arguments about the arbitration panel's bias towards employers, the difficulty of proving discrimination with arbitration's limited discovery, and the unequal bargaining power between employers and employees.[23]

*Gilmer* laid a solid foundation for the growth of mandatory arbitration agreements in employment contracts, and the following two decades of U.S. Supreme Court jurisprudence built upon *Gilmer*'s foundation. In *Circuit City v. Adams*,[24] the Court held that all employment contracts containing agreements to arbitrate are enforceable and fall within the scope of the FAA, with a narrow exception.[25] The Court afforded employees some protection in *EEOC v. Waffle House*[26] and found that mandatory arbitration provisions in employment contracts cannot preclude the EEOC from filing an enforcement action in a particular case.   However, *Rent-a-Center v. Jackson*[27] further strengthened employment arbitration when the Court held it lacked the authority to hear the employee's unconscionability claim where the agreement stipulated the arbitrator would "resolve any dispute relating to . . . the enforceability . . . of this Agreement."[28]

---

22.  *Gilmer*, 500 U.S. at 30.

23.  *Id.* at 30–33.  The *Gilmer* court found arbitration would not harm Mr. Gilmer because the parties agreed to the procedure, the procedures the employer set up were not unfair, and there was no inequality of bargaining power because Mr. Gilmer was an "experienced businessman." Reginald Alleyne, *Arbitrators' Fees: The Dagger in the Heart of Mandatory Arbitration for Statutory Discrimination Claims*, 6 U. PA. J. LAB. & EMP. L. 1 (2003).

24.  532 U.S. 105 (2001).

25.  *Id.* at 119.  The Court found that interstate transportation workers were the only category of employees who were exempt from the FAA. *Id.* at 121.

26.  534 U.S. 279, 296 (2002) (holding not to interfere with the EEOC's statutory function, regardless of whether the EEOC was filing a claim to pursue victim-specific relief or for broader public interest).  The decision was narrow.  The EEOC may enforce important public rights under Title VII and other anti-discriminatory statutes, but it is unclear whether this ability extends to other agencies.  Practically, the decision was unlikely to discourage mandatory arbitration in the employment context as EEOC litigates "less than one percent of enforcement suits annually." Robert J. Landry, III & Benjamin Hardy, *Mandatory Pre-Employment Arbitration Agreements: The Scattering, Smothering and Covering of Employee Rights*, 19 U. FLA. J.L. & PUB. POL'Y 479, 491 (2008).

27.  130 S. Ct. 2772 (2010).

28.  *Id.* at 2779.  Critics worried about *Rent-a-Center*'s reach and argued about the circularity of arbitrators deciding themselves whether the arbitration process is flawed: "After *Rent-a-Center*, employers may design their own arbitration scheme, confident that questions regarding the fairness of the scheme will not be heard by the courts but by arbitrators.  The law will now provide little oversight on employers in their use of mandatory arbitration clauses in

Since *Gilmer*, the Court has firmly established its support for mandatory arbitration clauses in employment agreements. The Court is "enamored" with arbitration[29] and has repeatedly reaffirmed an "emphatic federal policy in favor of arbitral dispute resolution."[30] The Court has interpreted the FAA as evidence of Congress' sweeping support for arbitration.[31]    The Court's support for arbitration is unlikely to change without a strong message from Congress to the contrary.    Therefore, congressional action is imperative to change the law of arbitration.

### III. EMPLOYERS AND EMPLOYEES: PLAYERS IN THE MANDATORY ARBITRATION CONTROVERSY

The rise of employment arbitration agreements traces back to Congress' enactment of Title VII and other anti-discriminatory statutes.[32]  As a result, there was a subsequent rise in employment litigation.[33]  Employers began to include mandatory arbitration clauses in their employment agreements to minimize contact with the judicial system and the risk of unfavorable verdicts.[34]

Employers find arbitration appealing for several reasons. Corporations are easily undone by bad publicity, and they highly value the private nature of arbitration.[35]  Arbitration saves time and money.[36]  Employment disputes are well suited to the informality and limited discovery of arbitration because the disputes tend to involve

---

employment agreements." Griffin Toronjo Pivateau, *Private Resolution of Public Disputes: Employment, Arbitration, and the Statutory Cause of Action*, 32 PACE L. REV. 114 (2012).

29.  Pivateau, *supra* note 28, at 135 (quoting Richard A. Bales, *How Can Congress Make a More Equitable Federal Arbitration Act*, 113 PENN ST. L. REV. 1081, 1085 (2009)).

30.  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985).

31.  Pivateau, *supra* note 28, at 136.

32.  *Id.* at 120 (Title VII and the subsequent amendments prohibited employment discrimination on the basis of race, color, religion, sex, national origin, age, pregnancy, and disability).

33.  *Id.*

34.  *Id.* at 121.

35.  Jeremiah A. Byrne, Note, *"Another Day" Has Come and Gone: Circuit City Stores, Inc. v. Adams, Application of the Federal Arbitration Act to Employment Disputes*, 40 BRANDEIS L.J. 163, 183 (2001).

36.  Elizabeth A. Roma, *Mandatory Arbitration Clauses in Employment Contracts and the Need for Meaningful Judicial Review*, 12 AM. U. J. GENDER SOC. POL'Y & L. 519, 540 (2004). *But see* Alleyne, *supra* note 23, at 5 ("[F]resh empirical data indicates that arbitration is not, as is conventionally thought to be, an inexpensive means of resolving statutory disputes.").

small amounts of money and are typically patterned and repetitive.[37]

Employers also benefit because comparable cases in arbitration tend to produce lower awards than litigation.[38] This results in lower employee expectations, which reflect in lower settlements and fewer cases filed.[39] Even if the award in arbitration is identical to litigation, employers still pay less because the process costs (time and legal fees spent on pleadings, discovery, motions, trial, hearings or appeals) are lower in arbitration.[40] Arbitration helps avoid frivolous suits intended to extort settlements from employers who would rather settle than pay litigation costs.[41] The threat of punitive damages is also less in an arbitral forum.[42]

Employers also recognize their advantage in arbitration as the repeat player.[43] Since arbitrators typically are from the business world, corporate defendants may sense "a better chance of gaining sympathy, if not straight bias" from arbitrators.[44] When an employer unilaterally selects and pays the arbitrator, it is difficult to escape the notion of partiality—the arbitrator becomes "a paid piper who plays the tune" the employer calls.[45]

Employees can also benefit from some of arbitration's advantages. Arbitration results in cheaper attorney's fees, resolves cases faster, and is more likely to preserve a good relationship with an employer.[46] Arbitration proponents argue that the lower cost of arbitration allows employer savings to funnel into more generous employee compensation and benefits.[47] Arbitration also provides a more accessible forum to employees who cannot afford to litigate.[48]

---

37. Schwartz, *supra* note 8, at 60.

38. Ware, *supra* note 4, at 747 (noting there are fewer cases in which employers pay at all, and in those limited cases, employers pay less on average).

39. *Id.*

40. *Id.* at 747–48.

41. Yongdan Li, *Applying the Doctrine of Unconscionability to Employment Arbitration Agreements, with Emphasis on Class Action/Arbitration Waivers*, 31 WHITTIER L. REV. 665, 696 (2010).

42. Erin O'Hara O'Connor, Kenneth J. Martin, & Randall S. Thomas, *Customizing Employment Arbitration*, 98 IOWA L. REV. 133, 142 (2012).

43. Li, *supra* note 41, 698–99.

44. McCandless, *supra* note 9, at 231.

45. Alleyne, *supra* note 23, at 5.

46. O'Connor et al., *supra* note 42, at 150–51; Schwartz, *supra* note 8, at 60.

47. O'Connor et al., *supra* note 42, at 151. This does not mean money saved in arbitration actually goes to employee compensation and benefits; rather, it is one economic justification that may have little basis in reality.

48. Li, *supra* note 41, at 697.

Both parties benefit from arbitrators having industry experience and familiarity with relevant customs and trade usage.[49]  Statistics indicate employees are more likely to recover damages in arbitration.[50]  On the other hand, arbitrators tend to give smaller awards than juries.[51]

While there are advantages to employment arbitration, the mandatory element of arbitration agreements in employment contracts introduces fairness problems.  In this arena, employees are at a severe disadvantage because of the power imbalance, the repeat player problem, and the agreements' inclusion of statutory rights.

## IV. ANALYSIS: THE FAIRNESS PROBLEM IN MANDATORY EMPLOYMENT ARBITRATION

### A.  *The Employer/Employee Power Imbalance*

Under the FAA, parties may challenge arbitration agreements on the same grounds as any other contract.[52]  To litigate rather than arbitrate, a party must prove contract defenses such as misrepresentation, duress, or unconscionability.[53]  The justification for the "strict judicial respect" for arbitration agreements is based on a belief that if parties agree to resolve their dispute through arbitration, a court should not interfere with the parties' original intent.[54]  The best challenge to these clauses on contract grounds lies in the lack of choice and resulting unconscionability of the agreements.

A court will strike down contract provisions in whole or in part if the agreement is both procedurally and substantively unconscionable and enforcing the contract as written "would be fundamentally

---

49.  O'Connor et al., *supra* note 42, at 142.  However, some arbitrators have no experience with a particular area of law; some arbitrators are not even trained lawyers. Roma, *supra* note 36, at 538.

50.  Byrne, *supra* note 35, at 182 (citing Rosenberg v. Merrill Lynch, 170 F.3d 1, 7 n.4 (1st Cir. 1999)).

51.  Schwartz, *supra* note 8, at 60.

52.  9 U.S.C. § 2 (2012) ("[An arbitration agreement shall be] valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.").

53.  Ware, *supra* note 4, at 738.  At this point, courts have not found lack of consideration to be a defense; instead, courts find continued employment to be adequate consideration for the contract. Pivateau, *supra* note 28, at 128.

54.  Russell Evans, Note, Engalla v. Permanente Medical Group, Inc.*: Can Arbitration Clauses in Employment Contracts Survive a "Fairness" Analysis?*, 50 HASTINGS L.J. 635, 653 (1999).

unfair."[55]   Procedural unconscionability is present when "a party lacks a meaningful choice" or the bargaining process makes the court question a party's "true assent" to the contract.[56]   Substantive unconscionability is present "when the terms of the bargain unreasonably favor one party," or the terms are overly harsh.[57]

Some courts consider adhesion contracts (those offered on a take-it-or-leave-it basis) to have elements of procedural unconscionability and will invalidate them if they appear to be oppressive or unfairly one sided.[58]   Most arbitration literature "assumes that parties face a binary choice between courts and arbitration for the resolution of all of their disputes."[59]   This ignores the reality that most employees lack any meaningful choice.[60] Employers have exclusive control over the employment agreement and all terms of the employment relationship.[61]   Employees are in "no position to bargain or shop for a better term."[62]

The power imbalance in employment relationships results in contracts that are not bargained-for exchanges.[63]   The relationship between an employer and an employee is "inherently asymmetrical."[64]   Employees typically receive contracts containing mandatory arbitration clauses as a condition for new or continued employment on a take-it-or-leave-it basis.[65]   These agreements are not the result of negotiations between parties of roughly equal bargaining power; rather, employers unilaterally decide to arbitrate disputes and plan arbitration procedures with no employee input.[66]   Employers rarely provide information on arbitration, and many employees do not understand the rights they relinquish when they sign employment contracts.[67]   Even if employees understand arbitration provisions, the majority still lack the bargaining power to change any terms of the

---

55.   O'Connor et al., *supra* note 42, at 147.

56.   *Id.* at 148.

57.   *Id.*

58.   Li, *supra* note 41, at 671; O'Connor et al., *supra* note 42, at 148.

59.   O'Connor et al., *supra* note 42, at 137.

60.   *Id.*

61.   Pivateau, *supra* note 28, at 128.

62.   Schwartz, *supra* note 8, at 57.

63.   Pivateau, *supra* note 28, at 125.

64.   *Id.* at 127.

65.   Li, *supra* note 41, at 698 (internal quotation marks omitted).

66.   Pivateau, *supra* note 28, at 125.

67.   *Id.*

employment contract, including the arbitration clause.[68]

In spite of the lack of a bargained-for exchange, courts continue to uphold arbitration agreements as a matter of contract.[69] The economic climate exacerbates the divide in bargaining power.[70] As the signing of a mandatory arbitration clause is often a condition of employment, "applicants who are limited in employment options are essentially required to sign such agreements."[71] These employment contracts with mandatory arbitration clauses are procedurally unconscionable.

In Section A, I examined procedural unconscionability in mandatory arbitration agreements. In Part III, I looked at the benefits of arbitration for the employer and began to demonstrate that these clauses are substantively unconscionable because "the terms of the bargain unreasonably favor one party."[72] In the following two sections, I will expand on this issue, and also will show how mandatory arbitration agreements result in overly harsh terms for employees.

## B. *Whoever Pays the Piper Calls the Tune: The Repeat Player Bias*

As briefly discussed in Part III, employers benefit from being repeat players in arbitrations.[73] Arbitrators are biased "either subconsciously or intentionally" toward the employer.[74] One court took note of various studies that show arbitration is "advantageous to employers . . . because it reduces the size of the award that an employee is likely to get, particularly if the employer is a 'repeat player' in the arbitration system."[75]

The Court has ignored this presumption of bias and believes parties are able to find "competent, conscientious and impartial arbitrators."[76] This view overlooks the reality that "individual

---

68.  Landry, III et al., *supra* note 26, at 494; Pivateau, *supra* note 28, at 127.

69.  Pivateau, *supra* note 28, at 128.

70.  *See* Walter J. Gershenfeld, *Pre-Employment Dispute Arbitration Agreements: Yes, No and Maybe*, 14 HOFSTRA LAB. & EMP. L.J. 245 (1996). Even in 1996, many individuals who found the job market difficult signed pre-employment agreements because it allowed them to obtain work: they believed "no alternative [was] available." *Id.*

71.  Landry, III et al., *supra* note 26, at 482.

72.  O'Connor et al., *supra* note 42, at 148.

73.  Li, *supra* note 41, at 698–99.

74.  *Id.*

75.  Armendariz v. Found. Health Psychcare, 6 P.3d 669, 690 (Cal. 2000).

76.  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 634

*WILLAMETTE LAW REVIEW* [50:259

arbitrators have an economic stake in being selected again."[77] The Court also discounts that the arbitrators' need "to build a 'track record' of decisions that corporate repeat-users will view approvingly" likely clouds their judgment.[78] In the best-known study of employment arbitration, Lisa Bingham found that employers who are repeat players fare better in arbitration than employers who only arbitrate once.[79] The employer's repeated use of arbitration creates an institutional bias "whereby an arbitrator who desires future work will be hesitant to render a decision that is contrary to the employer's expectations."[80] Employers that act rationally will use this knowledge to pick an arbitrator or arbitration association who will produce "results biased in their favor."[81]

Even if arbitrators are not biased, employers still have an advantage as repeat players because they have superior knowledge about arbitrating disputes.[82] Compared to employers, employees are at a distinct disadvantage because they lack relationships with and information about arbitrators.[83] Therefore, arbitration benefits employers over employees regardless of whether bias is present.

In spite of the evidence of arbitrator bias in employment arbitration, it is exceedingly hard to make an arbitrator's partiality an issue that would justify the court overturning an arbitrator's judgment.[84] However, the arbitrator's bias toward the employer goes to show the substantive unconscionability of arbitration clauses in employment contracts. Arbitration's institutional bias towards employers, the repeat players, demonstrates that mandatory arbitration clauses unreasonably favor one party (the employer). Under this analysis, arbitration clauses where the employer unilaterally selects the arbitrator should be automatically

---

(1985).

77.  Schwartz, *supra* note 8, at 57.

78.  *Id.* at 60–61.

79.  Ware, *supra* note 4, at 751.  Other studies show that "employers with multiple cases in front of the same arbitration association fare better in arbitration than do employers that do not arbitrate multiple cases."  Employers that arbitrate multiple cases with the same arbitrator do better than employers that use different arbitrators to arbitrate multiple cases. O'Connor et al., *supra* note 42, at 150.

80.  Evans, *supra* note 54, at 644.

81.  O'Connor et al., *supra* note 42, at 150.

82.  Li, *supra* note 41, at 698–99.

83.  Evans, *supra* note 54, at 644.

84.  Alleyne, *supra* note 23, at 41.

unenforceable because of the employer's clear advantage.[85]    The repeat player bias makes mandatory arbitration clauses inherently unfair, regardless of whether the employee helps to choose the arbitrator.

## C. The Inclusion of Statutory Rights Hurts the Powerless

In *Gilmer*, the Court upheld the arbitrability of statutory rights in employment contracts.[86]  However, over twenty years later, scholars continue to protest the "effective privatization of civil rights and other discrimination claims in arbitration."[87]  Statutory rights present two problems in the arbitration fairness analysis.  First, the privatization of statutory anti-discrimination claims results in an effective waiver. Second, statutory claims hurt the groups with the least power, which are the very groups Congress created the statutes to protect.  As a result, statutory claims in mandatory arbitration clauses are substantively unconscionable because they result in overly harsh terms for employees.

For example, Congress enacted Title VII and other anti-discriminatory statutes to protect employees from discrimination on the basis of race, sex, age, and disability.[88]  Employees cannot waive these statutory rights, and the law provides public enforcement mechanisms and remedies.[89]  Compulsory arbitration clashes with the public policies at stake in anti-discriminatory legislation because it amounts to a waiver of the employee's statutory rights.[90]  Private arbitration is not equipped to deal with statutory discrimination cases because its "non-standardized procedures, questions of fairness, questions of due process, and a lack of transparency[]" are almost certain to "perpetuate the problem of employment discrimination."[91]

There are several procedural problems with arbitrators deciding statutory claims.  The Federal Rules of Evidence do not apply.[92] Courts review arbitration awards under an "extremely deferential

---

85.  Evans, *supra* note 54, at 644 (explaining that in many cases, employers have sole power to choose the arbitrator).

86.  Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991).

87.  O'Connor et al., *supra* note 42, at 149.

88.  Landry, III et al., *supra* note 26, at 480; Pivateau, *supra* note 28, at 126.

89.  Pivateau, *supra* note 28, at 126.

90.  Landry, III et al., *supra* note 26, at 480; Pivateau, *supra* note 28, at 126. *But see Gilmer*, 500 U.S. at 26 (disagreeing with the assertion).

91.  Pivateau, *supra* note 28, at 127.

92.  Landry, III et al., *supra* note 26, at 483.

standard," which means the decisions are effectively unreviewable.[93] Without this review, "an arbitrator can foreclose any possibility of an employee vindicating his or her statutory rights."[94]   In addition, arbitrators are sometimes non-lawyers.[95]   When arbitrators who have not been legally trained are responsible for enforcing statutory rights, individuals risk "forgoing substantive rights."[96]   The Civil Rights Act of 1991 made the right to a jury trial available in employment cases.[97] Mandatory arbitration clauses force employees to waive their right to a jury trial and therefore deprive employees of this right.[98]   The limited discovery of arbitration puts employees filing statutory claims at a disadvantage as many of these claims are hard to prove without substantial discovery.[99]   Arbitrators are not required to issue written decisions; as a result, arbitrators lack public accountability.[100]

Arbitration hurts the powerless.   While high-wage employees fare similarly in arbitration as in courts, low-wage employees do relatively worse in arbitration.[101]   Women and people of color who agree to arbitrate statutory claims are "barred from bringing sexual or racial harassment and discrimination claims to juries of their peers."[102]    Instead, these groups face "an arbitrator pool that is demographically unrepresentative in terms of gender and race."[103] Women and minorities disproportionately suffer from sexual and racial harassment.[104]   Thus, a requirement that all employees arbitrate every employment dispute unduly burdens those that anti-discrimination statutes otherwise protect.[105]   This logic extends to age and disability discrimination.   Some critics argue compulsory workplace arbitration is particularly unfair to women.  In arbitration

---

93.   Li, *supra* note 41, at 700.

94.   *Id.*

95.   Roma, *supra* note 36, at 531.

96.   *Id.*

97.   Landry, III et al., *supra* note 26, at 484.

98.   *Id.*

99.   *Id.*

100.   *Id.*

101.   O'Connor et al., *supra* note 42, at 149.  However, low-wage employees also lack meaningful access to courts since their claims often fail to attract counsel. *Id.* at 149–50.

102.   Miriam A. Cherry, Note, *Not-So Arbitrary Arbitration: Using Title VII Disparate Impact Analysis to Invalidate Employment Contracts That Discriminate*, 21 HARV. WOMEN'S L.J. 267, 269 (1998).

103.   *Id.*

104.   *Id.* at 300–01.

105.   *Id.*

proceedings, women win a lower percentage of claims and are "less likely than men to receive attorney's fees or punitive damage awards in arbitration."[106]   This figure is disheartening in light of the low number of women who are chosen as arbitrators: in 2010, women were appointed in roughly 15 percent of AAA arbitrations involving claims for money.[107]

Arbitration of statutory rights fails to satisfy the deterrent purpose of the federal statutes.[108]   Arbitration is inherently private in nature, and as a result, fails to publicly expose corporate wrongdoing.[109]   The private nature of arbitration impedes employees' access to proof because employees cannot use past arbitral findings to prove patterns of discrimination.[110]   Employers do not have to face the same negative publicity as they would in court.[111]   In addition, discovery limits in arbitration similarly inhibits employees' ability to prove complex discrimination cases.[112]   Therefore, while litigation serves as a strong deterrent to discriminatory behaviors, arbitration does not.[113]

Many critics argue the Court's reliance on traditional contract principles as support for the mandatory employment clauses is "disingenuous" because the employment relationship is subject to external law in a way private contracts are not.[114]   The government controls the employment relationship through statutory requirements on hours and wages, health and safety in the workplace, and social security and federal income taxes.[115]   Therefore, the Court would not be acting in a revolutionary manner if it required fairness standards for mandatory arbitration agreements.

Mandatory arbitration clauses in employment contracts are unfair because of the procedural problems with arbitrating statutory

---

106.   Dunham, *supra* note 13, at 319.

107.   Deborah Rothman, *Gender Diversity in Arbitrator Selection*, DISP. RESOL. MAG., Spring 2012, at 23.  These statistics vary by arbitration association, but Rothman's statistics indicate 15% may be a generous estimate.  The International Institute for Conflict Prevention & Resolution (CPR Institute) reported in 2011 that women comprised 10% of their neutrals and were selected 13% of the time. *Id.* at 23–24.

108.   Dunham, *supra* note 13, at 303.

109.   *Id.* at 324–25.

110.   Li, *supra* note 41, at 699–700.

111.   *Id.*

112.   Evans, *supra* note 54, at 644.

113.   *Id.*

114.   Pivateau, *supra* note 28, at 130.

115.   *Id.* at 129.

claims, the disproportionate harm to groups Congress intended to protect in Title VII and similar statutes, and the lack of deterrence of discriminatory claims. For all these reasons, the inclusion of statutory terms in mandatory arbitration clauses constitutes overly harsh terms for employees and is substantively unconscionable.

## V. Solutions and the Future of the Mandatory Employment Arbitration Problem

The most effective and straightforward solution to the problem of unfairness in mandatory employment arbitration would be for Congress to enact the Arbitration Fairness Act (AFA). The AFA states: "[N]o predispute arbitration agreement shall be valid or enforceable if it requires arbitration of an employment dispute."[116] The AFA's findings acknowledge mandatory arbitration's core problems: for one, mandatory arbitration in employment disputes goes against the original intent of the FAA.[117] Congress' original intent was for the FAA to apply to disputes between "commercial entities of generally similar sophistication and bargaining power."[118] In addition, the AFA's findings recognize concerns that employees have "little or no meaningful choice whether to submit their claims to arbitration."[119] The AFA also points to problems with inadequate transparency in arbitration and the lack of judicial review of an arbitrators' decision.[120] The AFA acknowledges that arbitration is an "acceptable alternative" to litigation, but only when consent to arbitration is "truly voluntary" and "occurs after the dispute arises."[121]

Critics argue that the AFA is too broad, and that a "blanket prohibition on the enforcement of arbitration clauses" is unwarranted.[122] Others argue that arbitration associations are already solving unfairness problems with arbitration by enacting minimum standards for employment arbitration.[123]

---

116.  Arbitration Fairness Act of 2011, S. 987, 112th Cong. (2011).

117.  *Id.*

118.  *Id.*

119.  *Id.*

120.  *Id.*

121.  *Id.*

122.  O'Connor et al., *supra* note 42, at 182.

123.  *Id.* at 151–52; John-Paul Motley, Note, *Compulsory Arbitration Agreements in Employment Contracts from* Gardner-Denver *to* Austin*: The Legal Uncertainty and Why Employers Should Choose Not to Use Preemployment Arbitration Agreements*, 51 Vand. L. Rev. 687, 713 (1998).  These critics think the market sees problems with unfairness in

As Congress has not yet enacted the AFA, some scholars propose solving problems with mandatory employment arbitration with guarantees of due process and fairness.[124] These safeguards include meaningful judicial review of arbitration decisions that are explained in writing. Courts could establish arbitration standards to ensure individuals do not forgo their statutory claims in arbitration.[125] Other due process protections involve cost sharing of arbitrator fees, expanded discovery requirements, and "arbitrators chosen from a pool of sexually and racially diverse individuals who reflect workplace demographics."[126] Some critics of mandatory arbitration argue the employer must "explicitly and painstakingly disclose the rights the employee is sacrificing" so that waiver of a jury trial is "clear, knowing and voluntary."[127] While these safeguards would solve some problems with mandatory arbitration, the best solution would be for Congress to enact the AFA.

## VI. CONCLUSION

Mandatory arbitration clauses in employment contracts are unfair, damaging to employees, and particularly harmful to racial minorities, women, the aged, and the disabled. These predispute clauses are unfair because of: (a) the power imbalance between employers and employees at the time of contracting that results in an unconscionable contract; (b) the arbitrator's inherent bias toward the employer, the repeat player; and (c) the effective waiver of statutory rights and the resulting harm on the powerless in society.

Arbitration has many benefits, but cannot survive a fairness analysis unless both parties have the ability to voluntarily, knowingly, and without pressure or coercion, choose to arbitrate rather than litigate claims. While litigation is not perfect, it has the benefit of an appellate process and reviewability, judges that are well versed in the law, and the opportunity for trial by a jury of one's peers.

Mandatory arbitration clauses should never be in employment contracts. Rather, if employers wish to arbitrate claims, employers

---

mandatory arbitration and will fix unfairness problems to survive. *Id.* at 713. However, since the market usually is not a responsible or efficient method of fixing injustice in society, I argue congressional action is still preferable.

124. Pivateau, *supra* note 28, at 143.
125. Roma, *supra* note 36, at 542–44.
126. Evans, *supra* note 54, at 662–63.
127. Cherry, *supra* note 102, at 292.

should fully inform employees of the benefits and detriments of arbitration and allow employees to choose to arbitrate or litigate. There also must be procedural protections to ensure the arbitrator pool represents the diverse employment field,[128] and that the arbitrator is not biased toward the repeat player.

Congress should enact the AFA and ban all predispute employment arbitration agreements. This would solve the fairness problem; regardless of the procedural safeguards, if arbitration is mandatory, the majority of employees will always be in a weaker position than the employer. Efficiency and capitalism motivate much of American economics, but the judicial system exists to protect individual rights. Principals of efficiency and support for business cannot continue to trump employee's rights. Congress should enact the AFA and restore the original purpose of the FAA.[129]

---

128. Evans, *supra* note 54, at 662–63.

129. *See also* Motley, *supra* note 123, at 709. Legislative history demonstrates that Congress did not intend for arbitration to replace the court system; the House Report for the adoption of the Americans with Disabilities Act (ADA) implies that "even voluntary agreements were not intended to interfere with an individual's right to sue in federal court." *Id.* The House Report stated, "[u]nder no condition would an arbitration clause in . . . an employment contract prevent an individual from pursuing their rights under the ADA." H.R. CONF. REP. NO. 101-596, at 89 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 598.

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the aforesaid county, State of California; I am over the age of 18 years and not a party to the within action.  My business address is: 23801 Calabasas Road, Suite 2001, Calabasas, CA 91302.

On **June 30, 2022,** I served the foregoing document titled: **Plaintiff's Opposition to Defendant's Motion to Compel Arbitration,** upon the following parties in this action as follows:

| | |
|---|---|
| Brandie N. Charles, Bar No. 188892<br>bcharles@littler.com<br>Zeeshan Kabani, Bar No. 322638<br>zkabani@littler.com<br>LITTLER MENDELSON P.C.<br>2049 Century Park East 5th Floor Los Angeles, California 90067.3107<br>Telephone: 310.553.0308<br>Fax No.: 800.715.1330 | **Counsel for Defendants** |

[]    **BY MAIL:** I caused such envelope with postage thereon fully prepaid to be placed in the United States Mail at Calabasas, California to the address listed above.

[]    **BY PERSONAL SERVICE:** I caused the service of such document to be personally delivered to addressee(s).

[X]    **BY EMAIL SERVICE:** On today's date, I caused such documents to be transmitted by electronic mail to the address listed above and noted above.

[X]    I declare under penalty of perjury that the foregoing is true and correct.

Executed on **June 30, 2023,** at Calabasas, California.

Samuel C.P. Hauser

- 3 -

Proof of Service